## SOUTHERN PAC. CO. v. BURKE.

(Circuit Court of Appeals, Fifth Circuit. February 20, 1893.)

### No. 61.

MASTER AND SERVANT — INJURY TO BRAKEMAN FROM DEFECTIVE COUPLINGS — QUESTION FOR JURY.

Plaintiff, a brakeman in defendant's employ, was required by its yard master to make a coupling between a caboose with an old-style draw-head and a train of seven sleepers with the Miller coupling. On the train pulling out, the caboose became detached, and the train was backed to enable him to recouple it. He went between the stationary cars, but found the link pin fast, and, while hammering it out, the train, without signal from him, suddenly backed, and crushed him. The engineer testified that he backed on signal from the rear of the train. The testimony showed that such couplings were not in their construction intended to be used together, and, in making connections with them, there was unusual danger; that they were, however, constantly used together by defendant; that plaintiff was acquainted with the company's rule in regard to making such couplings, and was following it when hurt; that he had been switching about two years, and had made such couplings only two or three times; that, had the caboose been coupled at the head of the train, there would have been much less danger, because the engineer could have seen and talked with the brakeman; that the pin used was a square pin, and had it been a round pin, fitting the hole, it could have been easily drawn out. Held, that the questions of negligence and contributory negligence were properly submitted to the jury. Pardee, Circuit Judge, dissenting.

In Error to the Circuit Court of the United States for the Eastern District of Texas.

Robert S. Burke, the defendant in error, brought his action in the circuit court of the United States for the eastern district of Texas, at Galveston, against the Southern Pacific Company, plaintiff in error, to recover damages for personal injuries alleged to have been caused by the gross negligence of the company while he was an employé of the same, by which he lost his right arm, and suffered other serious injuries, to his damage $10,000. The defendant company first filed a plea to the jurisdiction of the court, on the ground that neither the plaintiff nor defendant at the institution of the suit were resident citizens of the eastern district of Texas, which plea being overruled, the defendant company filed, under leave of the court, a demurrer and a general denial, and answered specially that Burke had been long in the service of the company as switchman; that he assumed all such risks as were incident to his employment; that he understood the nature and the extent of the service, and assumed all visible risks, whether ordinarily incident to the service or not, and all risks occurring through the carelessness, negligence, and unskillfulness of his coemployés in and about defendant's business, and all patent defects in the machinery, tools, cars, and appliances used on defendant's road; that defendant company used all proper care in procuring proper machinery and appliances, and skillful and experienced officers and laborers; that the machinery, track, and appliances were in

good order and suitable condition, and that the injury was caused by the want of care of the plaintiff, and in violation of the rules of the defendant company; and, further, specially answered that if any such injury occurred to plaintiff, as alleged, it was caused by the want of care of the coemployés in the employment of the defendant company, for which it was not liable. The defendant company also pleaded the statute of limitations for 12 months.

On the trial of the case, the cause was submitted to the jury on the issues joined, and on the following evidence:

"'I was at that time about 19 years of age. I was employed by the defendant company as a switchman in its yards at Del Rio, Texas. Del Rio is an end of a division of the Southern Pacific Company. It is the end of the San Antonio division. Trains arriving at Del Rio from the east change crews. At about the hour of 7:30 or 8 o'clock p. m. on this night a train arrived at Del Rio from the east. It was an express passenger train, destined for California. As soon as this train arrived at Del Rio, and the train crew, conductor, engineer, and brakeman which had accompanied it to Del Rio left, it was turned over to Mr. Wade, the company's yard master at Del Rio, and the yard crew. I was one of the yard crew, working under Mr. Wade. This train consisted of an engine, a baggage and express car, seven Pullman sleeping cars, and at the end a caboose car, such as is used in the making up of freight trains. A caboose car is one which belongs to a freight train; a car in which the men belonging to a freight train sleep and ride. Engineer Norton relieved the engineer who brought in the express train. We received orders from Mr. Wade, the yard master, to back the train in on a siding, and detach the caboose car at the rear of the train therefrom, and to attach another caboose car which was in the yards thereto. This was done. I was ordered by the yard master, Wade, to make the couplings, and to place the caboose car in the rear of the seven Pullman cars. Pullman cars have what is known as Miller couplers. They are what is known as self-couplers, having a sort of goose-neck coupler with a lateral motion, and when two cars with Miller drawheads come together they couple themselves. The caboose car has the same drawhead as freight cars,—a stationary drawhead. Such drawheads ·were never intended to be coupled together, as the drawheads are wholly dissimilar, and in bringing two such drawheads together for the purpose of making a coupling there is great danger of the drawheads passing each other, and crushing the switchman. The only way the coupling can be made with reasonable safety is to take the link out of the stationary drawhead, set the pin in the stationary drawhead, put the link in the Miller drawhead, guide the link with the hand as the two cars are brought together, and put the link in the slot of the stationary drawhead. The concussion will cause the pin to drop as set in the stationary drawhead, and the coupling is made. It is an unusual thing in railroad service to· couple passenger or Pullman cars onto cars having a stationary drawhead. I had been switching at the time of the accident about two years, and I had never made such a coupling more than two or three times. On this occasion, after the coupling between the rear Pullman and the caboose car had been made, the signal was given to the engineer to pull out of the yard, and in pulling out of the yard the caboose car became detached from the train. I signaled the engineer to stop, which he did. I then signaled him to back up, which he did. He knew from the signal which I gave him that the caboose car was detached from the rest of the train. He backed up until I signaled him to stop. I then went in between the rear Pullman and the caboose car to again couple them together. I found that the link was in the drawhead of the caboose car; that is, in the stationary drawhead. I had to get it out and put it in the drawhead of the Miller before I could make the coupling. I tried to pull the pin out. Found that it was stuck fast in the hole of the caboose drawhead, and I could not pull it with both hands. I found that it was a square pin, and, being in a round hole, the motion of the train had fastened it in the drawhead so that I could not pull it out without hammering it. As quick as I could I got a rock, and began hammering the pin so as to loosen it. This is the only way in which it could be gotten out. I was powerless to pull it out with my hands. While so engaged, the train sud-

v.60F.no.5—45

denly came back without signal from me, for the purpose of making the coupling. The two drawheads passed each other, as they always do when brought together unless the switchman places the link in the drawhead of the Miller, and guides it, as the two cars come together, with his hand, into the slot of the stationary drawhead. The concussion caused the pin which was fast in the caboose drawhead to be driven through my right hand, and so crushed it that it had to be amputated. The two cars in coming together, in consequence of the passing of the two drawheads, were brought so close together as to crush me in between the two, breaking several of my ribs, and so injuring me as to cause me months of suffering, heavy expense, and loss of employment. Had the pin been round instead of square, I could have readily pulled it out with my hands. All of defendant's express passenger trains at that time, destined for California, had attached to them caboose·cars. There was no reason for placing this caboose car in the rear of the seven Pullmans. It could have been put at the head of the train just as easy; and if it had been so placed, and it had come loose, I would have been, in recoupling it, within thirty-three feet of the engineer, so as to have talked to him and he to me, and not depended on signals. The risk to any switchman in making a coupling between a car with a Miller drawhead and a caboose car, the caboose car being placed at the head of the train instead of the rear, would have been very much less. The yard master, Wade, under whom I was working, was the highest authority of the railroad company at Del Rio. He had command of all the work done in the yards in handling and making up trains. He had authority to employ and discharge all men working in the yards. What I did I did under his orders.'

("Witness is here shown rule No. 41, which is as follows: 'Coupling Cars. 41. Train men and other employés are required to exercise the utmost caution to avoid injury to themselves and fellow employés, and they are especially enjoined to use great care in coupling and uncoupling cars. Coupling cars by hand is strictly prohibited in all cases where a stick can be used to guide the link. Do not go between the cars to couple them unless the drawbars are known to be in good order. In coupling the Miller hook on to the other styles of drawbars, first insert the link in the hook, using the pin chained to the Miller platform.')

"And he testified: 'I am acquainted with that rule. I was following it to the letter when I was hurt. I was doing my best to get the link out of the stationary drawhead in which it was fastened, so as to insert the link in the hook, using the pin chained to the Miller platform. The rule says that coupling cars by hand is strictly prohibited when a stick can be used to guide the link. This does not apply to making a coupling between a Miller drawhead and a stationary drawhead. In such a case you cannot guide the link with a stick. You have to guide it with your hand so as to insert the link in the slot of the stationary drawhead; otherwise, you will never make the coupling. I gave no signal to back the train when I was hurt, and no warning was given to me that the train was coming back until I was crushed between the two cars. The signal may have been given by Mr. Wade. He was back near where I was. I had been in railroad service when I was hurt since I was seventeen years of age, and had always given satisfaction as a switchman. My health was very seriously affected by the crushing that I got between the two cars when they came together. I am not as able-bodied and strong as I was when I was hurt. I was earning about $75 per month when I was hurt. Since I got about I have tried to learn telegraphy, and I can render fair service as a telegraph station agent at a small station; but in doing telegraph work in a general office, when both hands are required, I am unequal to the task, as I can only use one hand, and that the left hand.'

"Plaintiff reads in evidence the statute of the state of Texas, as follows: 'Art. 4233. In forming a passenger train, baggage or freight or merchandise or lumber cars shall not be placed in the rear of passenger cars; and if they or any of them, shall be so placed and any accident happen to life or limb, the officer or agent who so directed, or knowingly suffered such an arrangement, and the conductor and engineer of the train shall each and all be held guilty of intentionally causing the injury and be punished accordingly.'

"Defendant's witness Norton testified as follows: 'I was employed on the night that Burke was hurt as engineer for defendant's company in the yards at Del Rio, Texas.' I worked under the orders of the defendant's yard master, Wade. When a train came from the east, it was taken in charge by Yard Master Wade and his crew, the train crew leaving it at Del Rio. The yard master has charge of everything in the yards while trains are being handled and made up. He takes the place of the conductor that brought in the train, and no orders were followed except his. When the express passenger train came in on this night, I received orders from Wade (yard master) to back the train into the yards for the purpose of disconnecting the caboose car at the rear of the train, and attaching another caboose to the train in its place. The train was backed into the yards, the caboose disconnected, and another caboose attached. I received a signal to pull out. As I was pulling out I received a, signal to stop, and another to back, and then to stop; all of which I obeyed. I understood from the signal that the caboose at the rear had become detached from the train, which was a long train of Pullman cars, seven or more. After standing still a few minutes, I got a signal, coming from toward the rear of the train, to back again for the purpose of making the coupling. This I did, which resulted in the injuries to Burke. There was no reason for placing the caboose at the rear of the train. It could have just as well been placed next to the engine, instead of at the rear of a passenger car; and, if it had been so placed, the risk to a switchman in making a coupling would have been greatly decreased. This would have placed the switchman the distance of the tender and one car length from me,—say about thirty-three feet,—which would have enabled him to have talked to me, and I would have taken my signals by words of mouth from him instead of from the rear of a long train of passenger cars at night by lantern. It was the custom of the Southern Pacific Company to send a caboose car along with each of its express passenger trains, and the cabooses were always placed in the rear of the passenger cars. The caboose car could have been placed at the head of the train with more ease than in the rear. The placing of it in the rear of seven passenger cars was done by orders of Yard Master Wade. There is a rule of the company which prohibits freight cars from being placed in the rear of passenger cars. Caboose cars are cars used on freight trains for the use of the train crews. They have the same drawheads as freight cars,—stationary drawheads,—but have the same trucks as are used on passenger cars.' "

—Which was all the evidence in the cause; and, the same being submitted to the jury, defendant (plaintiff in error here), by its counsel, requested the judge to instruct the jury to find a verdict for the defendant, which instruction was refused, whereupon defendant then and there excepted.

The jury found a verdict for the plaintiff in the sum of $10,000, for which amount judgment was rendered against the defendant company. After vainly moving for a new trial, the defendant company sued out this writ of error, and brought the case to this court for review; making nine assignments of error, which may be summed up in the complaint that the evidence adduced on the trial was insufficient to warant a verdict for the plaintiff, and that the court erred in refusing to instruct the jury to find a verdict for the defendant.

T. N. Waul, for plaintiff in error.

Wheeler & Rhodes, for defendant in error.

Before PARDEE and McCORMICK, Circuit Judges, and LOCKE, District Judge.

LOCKE, District Judge (after stating the facts as above). The substance of the error assigned herein is that the court overruled defendant's demurrer to plaintiff's petition, and refused to instruct the jury to find a verdict for the defendant, and left the question of negligence on the part of the defendant or contributory negli-

gence on the part of the plaintiff for their consideration. In Railroad Co. v. Cox, 145 U. S. 593, 12 Sup. Ct. 905, Chief Justice Fuller says:

"The case should not be withdrawn from the jury unless the conclusion followed, as a matter of law, that no recovery could be had upon any view which could be properly taken of the facts the evidence tended to establish."

It is for the judge to say whether any facts have been established by sufficient evidence from which negligence can be reasonably inferred, and it is for the jury to say whether from those facts, when submitted to them, negligence ought to be inferred. Randall v. Railroad Co., 109 U. S. 478, 3 Sup. Ct. 322. The judge below found that the facts were established from which negligence might be inferred, and the jury has said that negligence ought to be inferred from them; and we have only to inquire whether the judge erred in so submitting the question, or, in other words, whether, in any view which could be taken of the facts, as a matter of law recovery could be had. The facts are plainly and distinctly stated in the testimony, and it but remains to apply them to the law. It has been repeatedly declared by the supreme court that while employés must assume the risk incident to the positions which they accept, and to the negligence of fellow servants, to a certain extent, yet the servant does not assume risks arising from want of skillful colaborers, or defective machinery. In Hough v. Railroad Co., 100 U. S. 213, Justice Harlan says:

"The obligation still remains to provide and maintain in suitable condition the machinery and apparatus to be used by its employés; an obligation the more important, and the degree of diligence in its performance the greater, in proportion to the dangers which may be encountered."

—Citing and approving Ford v. Railroad Co., 110 Mass. 241, where such doctrine is declared at more extended length. In Railroad Co. v. Herbert, 116 U. S. 642, 6 Sup. Ct. 590, Justice Field, in expressing the same idea, says:

"The servant does not undertake to incur the risks arising from the want of sufficient and skillful colaborers, or from defective machinery or instruments with which he is to work. His contract implies that, in regard to these matters, his employer will make adequate provisions that no danger shall ensue to him. This doctrine has been so frequently asserted by courts of the highest character that it can hardly be considered as any longer open to serious question."

Railroad Co. v. McDade, 135 U. S. 555, 10 Sup. Ct. 1044.

In this case the testimony was that the couplings were not in their construction intended to be used together, and in making connections with them there was unusual danger; that they were, though, habitually and constantly used together by defendant company; that plaintiff was acquainted with the company's rule in regard to making such couplings, and was following it to the letter when he was hurt; that he had been switching about two years, but had never had to make such couplings more than two or three times; that the pin used was a square or flat pin, and that had it been a round pin, fitting the hole in which it was used, he could have drawn it out with his hands, but, as it was, when he found it

jammed he was compelled to get a rock and attempt to drive it out, when he was injured by the backing train. The defendant introduced no evidence that the pin used was not a pin regularly furnished for such purpose, or that any more suitable one was provided, and we consider that an inference favorable to plaintiff's claim might reasonably be drawn from such testimony, standing uncontradicted and unexplained. Whether or not the character of the coupling and pin was faulty, and known to be so by defendant or defendant's officers, so that negligence might be inferred from their use, was certainly not a question of law upon which the court should pass; and whether the plaintiff was guilty of contributory negligence in going and remaining between the cars, while endeavoring to obey the commands of his superiors, could only be decided as a question of fact. Railroad Co. v. Stout, 17 Wall. 657; Railroad Co. v. McDade, 135 U. S. 555, 10 Sup. Ct. 1044.

In Kane v. Railway Co., 128 U. S. 91, 9 Sup. Ct. 16, a case in which the question of contributory negligence had been withdrawn from the jury, and a verdict for the company directed, which was held to be error, the question was whether the plaintiff, in attempting to pass over cars when he knew that a step was missing from one of them, on account of which fault he fell, and was injured, was in so doing guilty of contributory negligence so as to justify the court in withdrawing the question from the jury and directing a verdict for the defendants. The supreme court held, in effect, that in the case of an employé not abandoning his station and duty upon the discovery of an insufficiency of appliance or apparatus, but remaining and attempting to do the best he could, the entire surrounding circumstances should be submitted to the jury for them to determine whether or not he was so guilty of contributory negligence as to forfeit his right to recover. This we consider a safe and reasonable rule, and one which may be applied to this case, and that the question was properly submitted to the jury whether, under the circumstances, the plaintiff, in remaining and endeavoring to complete the coupling, although he found the square pin jammed in a round hole, was so guilty of contributory negligence as to prevent a recovery.

In Jones v. Railroad Co., 128 U. S. 444, 9 Sup. Ct. 118, Justice Miller, in speaking of the questions of negligence on the part of defendant and contributory negligence of the plaintiff, says:

"But we think these are questions for the jury to determine. We see no reason, so long as the jury system is the law of the land, and the jury is made the tribunal to decide disputed questions of fact, why it should not decide such questions as these as well as others."

In Railroad Co. v. Cox, supra, when the same question—the defect of coupling apparatus and the use of the square pin in a round hole—was under consideration, Chief Justice Fuller says:

"We think the evidence given in the record tended to establish that the coupling apparatus and the track were in an unsafe and dangerous condition; that the injury happened in consequence; and that those defects were such as must have been known to the defendants under proper inspection, and unless they were negligently ignorant."

In this case we think there was testimony which, uncontradicted as it was, tended to show that the appliances furnished for the coupling of the cars were insufficient, and rendered such duty unusually and unnecessarily dangerous, and in the performance of his duty, and on account of the fault of such appliances, plaintiff was injured; and whether or not such was the case was properly submitted to the jury. We therefore find no error in the record, and the judgment below is affirmed, with costs, and it is so ordered.

PARDEE, Circuit Judge. I respectfully dissent from the opinion and judgment of the court in this case because (1) the opinion implies, if it does not distinctly hold, that it is discretionary with the presiding judge on a trial before a jury in the courts of the United States to submit the case to the jury when the evidence submitted by the plaintiff is legally insufficient to warrant a verdict for the plaintiff; (2) the evidence submitted to the jury in the case in hand, with all the inferences that the jury could justifiably draw from it, was insufficient, in my opinion, to warrant a verdict for the plaintiff.

1. It is settled by the decisions of the supreme court of the United States that when the evidence given on a trial of the cause is insufficient to support a verdict for the plaintiff, so that such a verdict, if returned, should be set aside, the judge should not submit the case to the jury, but should direct them to return a verdict for the defendant. Commissioners v. Clark, 94 U. S. 284; Randall v. Railway Co., 109 U. S. 482, 3 Sup. Ct. 322; Gunther v. Insurance Co., 134 U. S. 116, 10 Sup. Ct. 448; Railroad Co. v. Converse, 139 U. S. 472, 11 Sup. Ct. 569, and cases there cited. See, also, Doyle v. Railway Co. (decided at this present term) 13 Sup. Ct. 333. "When there is no evidence, or such a defect in it that the law will not permit a verdict for the plaintiff, such an instruction may be demanded, and it is the duty of the court to give it. To refuse is error." Hickman v. Jones, 9 Wall. 197. See Armour v. Hahn, 111 U. S. 313, 4 Sup. Ct. 433.

2. The allegations in the petition charging the negligence of the company are as follows:

(1) In using the flat pin in a round hole of the stationary drawhead of the caboose car, for which it was wholly unfitted, and requiring to be made the coupling between the caboose car and its passenger car, the said square pin being inserted into a round hole, in which it became fastened as in a vise, and from which it could not be removed with the hand, as it could have been done if the pin had been round, and the proper pin for the purpose for which it was used.

(2) In violating the statute law of the state of Texas, and placing in the rear of its passenger train a caboose car, the same being a car belonging to one of its freight trains, and requiring your petitioner to make a coupling of said caboose car to the rear passenger car of its said passenger train; the said two cars being, from the construction of their respective drawheads, wholly unfitted to be coupled together, and the coupling of the same greatly imperiling the life and limb of your petitioner,—all of which was well known to said defendant.

(3) And in using its said cars, and, as a part of the equipments thereof, cars having drawheads which were never intended to be coupled together; the drawhead of the caboose car being a stationary drawhead, and designed to

be coupled to a stationary drawhead, and the drawhead of the passenger coach, to which plaintiff was ordered to couple said caboose car, being what is known as a Miller drawhead, the same being a movable drawhead, and what is known as a self-coupler, and designed to be coupled to a car having a similar drawhead, the natural effect of the bringing together of two such drawheads being that the drawheads so dissimilar, and not designed to be coupled together, would pass each other, as they did in this case, injuring and disfiguring your petitioner for life.

Taking the evidence given on the trial, with all the inferences that the jury could justifiably draw from it, is it sufficient to sustain a verdict in favor of the plaintiff, on the ground of negligence of the defendant company, under either of the three heads mentioned?

First. With regard to the use of the flat pin, the evidence shows that the defendant in error made the first coupling between the Pullman car and the caboose car; which coupling was, in some respects, defective, because, in pulling out of the yard, the caboose car became detached from the train, rendering a second coupling necessary, in the making of which the defendant in error got hurt. To make a case against the company of negligence on this account, it should appear that the company, through its agents, not only furnished and provided this square pin to be used, but also that the defendant in error used it under the specific directions of the company, or of some of its agents superior to himself in authority. None of this appears, nor does the testimony tend to show that the company knew, or could reasonably have known, that the flat pin was in use, or was used on any previous occasion; and the evidence is clear that the square pin was visible and seen by the defendant in error, and, that, after seeing it and noticing its defect (which, by the way, he should have noticed when he used it in the first coupling), and after failing at first effort to disengage it, he returned again, without protest or objection, to the work of disengaging it. He says:

"I tried to pull the pin out. Found that it was stuck fast in the hole of the caboose drawhead, and I couldn't pull it with both hands. I found that it was a square pin, and, being in a round hole, the motion of the train had fastened it in the drawhead, so that I couldn't pull it out without hammering it. As quick as I could, I got a rock, and began hammering the pin so as to loosen it."

According to the law of Texas, which should govern this case, if the employé knows of the defect in a piece of machinery he is called upon to use, by using it, except under orders of a superior, he takes the risk of the danger incident to that defect, whatever the danger may be. Railway Co. v. Somers, 78 Tex. 439, 14 S. W. 779; Railroad Co. v. Myers, 55 Tex. 116; Railway Co. v. Barrager (Tex. Sup.) 14 S. W. 242.

Second. The statute of the state of Texas which forbids the placing in the rear of passenger cars baggage or freight or merchandise or lumber cars, under a penalty, does not forbid the placing of a caboose car at the rear of the passenger cars in making up a passenger train. A caboose car is not a baggage car, nor a freight car, nor a lumber or merchandise car, but is, if classified as either

passenger or freight car, a passenger car, for which purpose it is generally used on all freight trains carrying passengers. Its make-up in a passenger train, if convenient or useful to the company, is entirely lawful, and from its use in this connection no negligence can be inferred. Besides this, the railway company may use such caboose in the make-up of its passenger trains at either end or in the middle thereof, as convenience may suggest, without being guilty of any negligence so far as the place in the train is concerned. The evidence shows that it was a custom of the Southern Pacific Company to send a caboose car with a train crew with each of its express passenger trains running west from Del Rio, to assist in case of accidents, and the cabooses were always placed in the rear of the passenger cars. The defendant in error testified that there was no reason for placing the caboose car in the rear of the passenger trains, and says "it could have been put at the head of the train just as easy." Even if this is taken to be true, still no negligence can be inferred therefrom, because the company had a right, so far as its employés were concerned, to put the caboose in that part of the train most convenient. As a matter of fact, however, if the caboose car had the link and pin coupling, while the passenger cars had the Miller coupling, to have placed the caboose car anywhere else except in the rear of the train would have greatly increased the inconvenience and risk to all the persons aboard the train, passengers as well as employés. The mischief to be remedied by the statute was the great risk and danger in hauling heavy and loaded freight cars behind passenger cars, and not any supposed danger to employés resulting from coupling said cars.

Third. No negligence can be inferred against the company because of the use of different drawheads on the cars lawfully coupled together in the same train. Certainly not in favor of any employé who, with full knowledge, as the defendant in error had, of the different drawheads, voluntarily assumes the duty of coupling cars. There is no law which requires any particular railroad to use only cars having uniform drawheads and coupling gear; and, until there is such a law, the use by any railroad of cars with dissimilar drawheads cannot be assigned as negligence. In fact, and resulting from the necessary interchange of cars, a general law adopting a uniform drawhead and coupling gear will be necessary before any particular railroad can be required to use only cars having uniformly the same coupling arrangements. From my view of the evidence, it is clear that the defendant in error was not injured through any fault of the plaintiff in error, nor of its agents, who, with regard to him, were vice principals; but was injured through the negligence of a fellow servant, his own negligence contributing thereto. The evidence clearly shows that the defendant in error was standing between the uncoupled cars of a train, in violation of the spirit of the company's rules, attempting to remedy the effect of his own conduct in previously using a square coupling pin, when his fellow servant, the engineer, without previous warning, backed the train and injured him. I am unable to

see, and the opinion of the court does not point out, how, by ordinary foresight, the railway management could have prevented the injury which the defendant in error received. The judgment of the circuit court should have been reversed, and a venire de novo awarded.

A motion for reargument was granted, and the case reheard before PARDEE and McCORMICK, Circuit Judges, and LOCKE, District Judge, and the following opinions were delivered:

----

(January 2, 1894.)

McCORMICK, Circuit Judge. This case was submitted on briefs of counsel at the last term of this court. A majority of the court delivered its decision, affirming the judgment of the circuit court. At a late day in that term a motion for rehearing was granted. The case has now been orally argued by counsel, and they have filed additional briefs. We have carefully re-examined the case. We conclude that the judgment of the circuit court must be affirmed. The case is stated in the opinion of the court delivered at the last term. We are content to rest our decision on the reasoning and the precedents therein relied on to support it. Our respect for the member of this court who could not concur in that opinion prompts a somewhat more extended statement of our views. The plaintiff in error urges only that "the court erred in refusing to instruct the jury to find a verdict for the defendant." The plaintiff in error says, in the brief filed on its behalf, December 5, 1892:

"There was no exception taken to the charge of the judge by the defendant, and no error complained of as the law was expounded to the jury, the error consisting in submitting the case to the jury in the absence of any testimony sufficient to justify a verdict."

The motion for an instruction to the jury to find for the defendant is substantially equivalent to the ancient practice of demurring to the evidence, a practice still followed in some of the states, but which never obtained in Texas. There, and in many of the states, a motion that the judge direct a verdict has become the practice in cases where a party deems that a demurrer to the evidence could be well taken. Such a motion was made in this case before the jury retired. It was refused. There was a verdict for the plaintiff, and a judgment thereon against the defendant. The defendant moved for a new trial. That motion was refused by the judge who tried the case, and the defendant brought this writ of error. It appears that the trial judge rightly understood the law applicable to the issues raised by the pleadings and by the evidence, if there was any evidence, and that the only error he made, the plaintiff in error being the judge, was in holding that the testimony proved or tended to prove facts from which fair-minded men might draw different conclusions as to whether the defendant was guilty of negligence under the law thus correctly given. Whether there is any evidence tending to prove the averments necessary to sustain a re-

covery is as much a question of law as whether the averments are
good on general demurrer.   What is evidence in the case, and
whether in all the testimony introduced there is any evidence tend-
ing to support each of the necessary averments, are questions of law
to be addressed to the judge, and his action thereon, when properly
invoked and duly excepted to and made part of the record, is subject
to review on writ of error.   It is not discretionary with the presid-
ing judge, on a trial before a jury in the courts of the United States,
to submit the case to the jury when the whole evidence introduced
on the trial is legally insufficient to warrant a verdict for the plain-
tiff.   Some issues are not susceptible of direct proof.   In a greater
or less degree, all issues admit of inferences from established facts
tending to establish the fact necessary to sustain the action.   Neg-
ligence, like fraud, is susceptible in a high degree of this character
of proof.   Subject to the rule that there must be some evidence, it
results from the nature of the case that the question of the existence
of actionable negligence is one of mixed law and fact.   Negligence
and contributory negligence are incapable of exact definition.   They
are relative terms.   To determine the existence of either as causing
directly, or assisting directly to cause, an injury from which damage
results, the conditions and mutual duties of the parties, the time,
the place, the business, and all the attendant circumstances of each
particular case must be considered.   It has not been settled by
judicial decisions, and probably will not be so settled, that any
specific acts constitute negligence per se, or that specific acts cannot
constitute negligence in some states of case which cannot be antici-
pated.   Many expressions occur in reported opinions to the effect
that this or that act or omission did or did not constitute or show
negligence.   All such language has relation to the case in which it
is used.   Courts of last resort, as well as courts of original jurisdic-
tion, have to dispose of issues of law sharply made by contending
parties.   The nature of the case and the conditions of the forum
do not require or admit of that nice weighing of words and phrases,
or that exhaustive statement of exceptions, which we would reason-
ably expect of a careful commentator.   Perhaps in no class of cases
is it more incumbent on us to distinguish between the authority
of the case and detached sentences of the opinion than in those
involving the question we are now considering.   The language
bearing on that subject, so often cited with emphasis, is found in
opinions affirming the ruling of the trial judge, or reversing his
decision when he had improperly withdrawn the case from the jury.
We have examined all the cases in the reports of the supreme court
which appear to us to be germane to our present argument, embra-
cing each case cited on the briefs for the plaintiff in error.   Of the
cases examined by us, only two were reversed in which the trial judge
refused to withdraw the case from the jury, and in one of these
(Steamship Co. v. Merchant, 133 U. S. 375, 10 Sup. Ct. 397) the rever-
sal was placed on the ground that the negligence proved was that of
a fellow servant.   The trial court had substantially submitted to
the jury the question whether different servants of one master, about

whose employment and service there was no dispute, were fellow servants. In the other case (Armour v. Hahn, 111 U. S. 313, 4 Sup. Ct. 433) it is decided that the facts established in that case do not show negligence on the part of the master, and that the circuit court erred in not so holding, and directing a verdict for the defendant. The result of the decisions we find stated in Railway Co. v. Ives, 144 U. S. 417, 12 Sup. Ct. 679:

"When a given state of facts is such that reasonable men may fairly differ upon the question as to whether there was negligence or not, the determination of the matter is for the jury. It is only where the facts are such that all reasonable men must draw the same conclusion from them that the question of negligence is ever considered as one of law for the court."

The cases we have examined are cited in a note to this opinion.[1]

We often hear, from counsel who represent large corporations, severe criticism on the conduct of juries in suits at common law for damages for personal injuries brought against corporations, and especially in such suits against railroad corporations. Our experience at the circuit, and the complexion of many records brought before us for review, attest that these criticisms are not unprovoked. Probably the provocation and the criticism alike result from the nature of the case. The volume of freight and passenger movement is immense. The number of persons engaged in it constitute a great army. The business is hazardous. The casualties that occur from unavoidable accident and from negligence exceed those commonly suffered from the conflict of armies in actual war. The sufferers are often subordinate employés, or other wage earners, on whose toil and earnings they and their wives and children, or other relatives to whom they owe and render duty, are dependent for support. It is to be expected that in every case the party injured will claim damages, and that the corporation will question its liability. The law furnishes no exact standard for measuring such unliquidated damages. It is not strange that the parties are often unable to adjust the matter. In such cases the claim must be abandoned or resort had to the courts, where the jury are charged to find from the evidence, under proper instructions and in the exercise of a sound discretion, whether the defendant was guilty of actionable negligence, from which the injury resulted, and, if so, the amount, if any, of damage to the plaintiff. In this contest the parties are often unequally matched. The plaintiff,

[1] Parks v. Ross, 11 How. 362; Schuchardt v. Allens, 1 Wall. 359; Hickman v. Jones, 9 Wall. 197; Merchants' Bank v. State Bank, 10 Wall. 637; Pleasants v. Fant, 22 Wall. 120; Commissioners v. Clark, 94 U. S. 284; Railroad Co. v. Houston, 95 U. S. 697; Randall v. Railroad Co., 109 U. S. 478, 3 Sup. Ct. 322; Tuttle v. Railway Co., 122 U. S. 189, 7 Sup. Ct. 1166; Brodnax v. Insurance Co., 128 U. S. 238, 9 Sup. Ct. 61; Jones v. Railroad Co., 128 U. S. 444, 9 Sup. Ct. 118; Coyne v. Railway Co., 133 U. S. 370, 10 Sup. Ct. 382; Gunther v. Insurance Co., 134 U. S. 116, 10 Sup. Ct. 448; Aerkfetz v. Humphreys, 145 U. S. 418, 12 Sup. Ct. 835; Oteri v. Scalzo, 145 U. S. 593, 12 Sup. Ct. 895; Railroad Co. v. Baugh, 149 U. S. 368, 13 Sup. Ct. 914; Railway Co. v. Mealer, 1 C. C. A. 633, 50 Fed. 725; Kidwell v. Railroad Co., 3 Woods, 313, Fed. Cas. No. 7,757; Bank v. Morgan, 117 U. S. 96, 6 Sup. Ct. 657; Kane v. Railway Co., 128 U. S. 91, 9 Sup. Ct. 16.

who has the burden of proof, is in many cases unable, and in others unwilling, to pay an attorney and the other costs of preparing and trying his case. From this has grown up a prevalent custom of contracting with practicing lawyers of skill and pecuniary means to take the case, conduct it, bear or guarantee the costs, and divide the recovery for compensation. It has been stated before us in oral argument, not in this case, nor by the counsel in this case, that in such cases the contract now customary in the state from which this case comes is for the lawyer to receive two-thirds of the recovery, to cover his fees and expenses, and the plaintiff to receive the remainder. An equal division of the recovery between the lawyer and his client has probably long been customary in that state and elsewhere. The corporation has salaried attorneys, permanently retained, who appear in every case. All the other practicing attorneys at the points where these suits are brought either have or have had such suits against the same defendant, or against a similar corporation, in which they have or have had this large personal interest. With the purest motives and the best of temper, this combination must, as it is known to do, have a strong tendency to bias the minds of the jury. The trial judge sees it, feels it, and, according to the temper of his mind, either unconsciously yields to it or holds himself over plumb against it. Others must say how far appellate judges are able to rise above this atmosphere, and hold an even balance. The evil is real and imminent. It may be difficult to devise an efficient remedy, and more difficult to secure its general adoption and application. In the courts of the United States, trial judges may grant new trials whenever and as often as in their judgment it is necessary to do so to mete out justice between the parties. Their action in granting or in refusing new trials cannot be assigned as error. Because of their absolute discretion in this matter, which long experience has sanctioned and found to be wholesome, they may be indulged and sustained in the exercise of a liberal discretion, though it be a legal, as distinguished from an absolute, discretion, in deciding before verdict that the proof will support only one verdict, and in directing the finding accordingly. They may well feel free to pursue this course, and should be encouraged to do so in all cases where in their judgment only one verdict should be permitted to stand. Such action, being subject to review, may be safely taken by the trial judge, and will be in the interest of economy of time and money to parties litigant and to the public. In this matter he exercises a legal discretion, but he acts on his own enlightened judgment; he is nearer the case than an appellate court can generally get, and, in a case like the present one, his judgment that reasonable men may fairly draw different conclusions from the proof merits consideration. The judgment of the circuit court is affirmed.

PARDEE, Circuit Judge. I adhere to the views expressed in my former opinion, and have little to add in view of the last opinion of the majority of the court. I do not question the law to be as

stated by Mr. Justice Lamar in Railway Co. v. Ives, 144 U. S. 417, 12 Sup. Ct. 679, that:

"When a given state of facts is such that reasonable men may fairly differ upon the question as to whether there was negligence or not, the determination of the matter is for the jury. It is only where the facts are such that all reasonable men must draw the same conclusion from them that the question of negligence is ever considered as one of law for the court."

In fact, I do not understand that my views of the law in regard to the respective provinces of the trial judge and the jury are at all out of accord with those of the supreme court, or that I differ with my associates in this court, except with regard to the application of the conceded rules on the subject. What I insist upon is that where, under the law, the duty of the trial judge is to direct a verdict, this court, in reviewing the case, properly shown by the record, should meet the full measure of its responsibilities, and that in such a case it is not sufficient to fall back on the trial judge's opinion, as conclusive, "that reasonable men may fairly differ as to the effect of the undisputed evidence in the case." And in this connection it is proper to say that the observations of the court as to the frequency of personal injury suits, the skill and acumen with which each side is presented, the what used to be called "champerty" prevailing at the bar, and the general surroundings on the trial of such cases,—all, it is intimated, creating an atmosphere of prejudice above which the trial judge may not always rise,—instead of being an argument in favor of giving great weight to the ruling of the trial judge, who is frequently called upon to act on the spur of the moment, without sufficient opportunity to analyze and fully weigh the evidence, rather point the other way, and really furnish a strong reason, if one is necessary, why this court should look well into every properly presented case of complaint, and see that the trial judge neither trenches on the legitimate province of the jury, nor mistakes or neglects or abdicates his duty as judge, to the prejudice of the parties.

I do not entirely agree with the majority opinion as to the absence of all definitions of negligence and contributory negligence. The supreme court of the United States in Railroad Co. v. Jones, 95 U. S. 439, attempted to define negligence and give some rules in relation thereto, and the case has been cited with approval several times since, and as recently as Railroad Co. v. Converse, 139 U. S. 474, 11 Sup. Ct. 569. In the present case, I am inclined to say, as Mr. Justice Field said in the very similar case (as to manner of presentation in the appellate court) of Railroad Co. v. Houston, 95 U. S. 702: "Not even a plausible pretext for the verdict can be suggested unless we wander from the evidence into the region of conjecture and speculation." The last opinion of the majority of the court does not undertake to point out the specific negligence of the railroad company which rendered it liable, or any of the fair inferences of negligence on its part which reasonable men might draw from the undisputed facts in the case. In this respect the case is left where the first opinion left it, and there the court entirely ignored the fact that the defendant in error was not in-

jured by reason of any defective appliances of which he did not know, and the risk of which he did not assume, nor even proximately injured by any defective appliances whatever, but was, by his own and the other undisputed evidence, directly and proximately injured by the unexpected backing of the train.

As to the negligence of the railroad in using cars with different coupling appliances, upon which the opinion lays some stress, and as generally bearing on the case in hand, Kohn v. McNulta, 147 U. S. 238, 13 Sup. Ct. 298, is instructive, and can be read with interest. I quote as follows:

"With respect to the merits of the case, the decision of the court was also clearly correct. The intervener was twenty-six years of age; he had been working as a blacksmith for about six years before entering into the employ of the defendant. He had been engaged in this work of coupling cars in the company's yard for over two months before the accident, and was therefore familiar with the tracks and condition of the yard, and not inexperienced in the business. He claims that the Wabash freight cars, which constituted by far the larger number of cars which passed through that yard, had none of those deadwoods or bumpers, but inasmuch as he had in fact seen and coupled cars like the ones that caused the accident, and that more than once, and as the deadwoods were obvious to anyone attempting to make the coupling, and the danger from them apparent, it must be held that it was one of the risks which he assumed in entering upon the service. A railroad company is guilty of no negligence in receiving into its yards, and passing over its line, cars, freight or passenger, different from those it itself owns and uses. * * * It is not pretended that these cars were out of repair, or in a defective condition, but simply that they were constructed differently from the Wabash cars in that they had double deadwoods or bumpers of unusual length, to protect the drawbars. But all this was obvious to even a passing glance, and the risk which there was in coupling such cars was apparent. It required no special skill or knowledge to detect it. The intervener was no boy, placed by the employer in a position of undisclosed danger, but a mature man, doing the ordinary work which he had engaged to do, and whose risks in this respect were obvious to any one. Under those circumstances, he assumed the risk of such an accident as this, and no negligence can be imputed to the employer."