## SCOTT v. CITY OF NEW ORLEANS.

(Circuit Court of Appeals, Fifth Circuit.   June 9, 1896.)

### No. 474.

1. CONTRIBUTORY NEGLIGENCE—QUESTIONS FOR JURY.

   In an action against a city for damages from a fall caused by an inequality negligently permitted to exist in a sidewalk, the defense being contributory negligence of the plaintiff, it appeared from the testimony of the plaintiff, who was the only witness to the occurrence, that he was a man of 70 years of age, but active and in possession of his faculties; that, having been a soldier, he was accustomed to walk in a very erect position; that while walking through the street where the accident occurred, with which he was not familiar, he stumbled over an obstruction, due to a difference of from four to six inches in the grade of the sidewalk; that there had been nothing to distract his attention or obstruct his view for some distance. but that the day was cloudy and gloomy, and the obstruction lay in the shadow of the gallery of a neighboring house. *Held,* that the question of plaintiff's contributory negligence was for the jury, and that it was error to direct a verdict for the defendant.

**2.** EVIDENCE—OCCURRENCES SIMILAR TO THOSE IN ISSUE.

In an action against a city for negligently permitting an obstruction to exist in a sidewalk, by means of which the plaintiff has been injured, evidence of similar accidents to other persons, through the same obstruction, is admissible.

**3.** SAME—PHOTOGRAPHS.

The difference between the images produced upon a photographic plate and upon the human eye does not render photographs of the place where an accident has been caused by an obstruction in a street inadmissible in evidence, but bears only upon the effect of such evidence.

In Error to the Circuit Court of the United States for the Eastern District of Louisiana.

Percy Roberts, for plaintiff in error.

Samuel C. Gilmore, for defendant in error.

Before PARDEE and McCORMICK, Circuit Judges, and SPEER, District Judge.

McCORMICK, Circuit Judge. On April 27, 1895, Louis Hellwig brought his action against the city of New Orleans, claiming that it was indebted to him in the sum of $20,000, charging as follows:

"That it is, and has been for many years past, the duty of said city to keep the sidewalks or banquettes within its limits, and especially the banquettes on Julia street, in said city, between Camp and St. Charles streets, in good and safe condition, and to have the same raised and leveled to the grade fixed by the said city, and make said sidewalks or banquettes safe and secure to pedestrians. That on the said 13th of February, 1895, your petitioner was walking from Camp towards St. Charles street, on the sidewalk or banquette on the lower side of said Julia street, and using due care, and without fault on his part, when, by reason of the said breach of duty of said city, and the dangerous condition of said banquette brought about by said breach of duty, he fell heavily to the sidewalk, breaking his kneecap, and receiving other and severe injuries from said fall. That he has ever since that fall, and as a consequence thereof, suffered great pain of body and of mind, and become a permanent cripple, whereby he has been damaged in the sum hereinbefore claimed."

In answer to this petition, the city pleaded the general issue, and that, if the plaintiff was injured as he alleged, the accident that caused his injury happened through his gross carelessness and contributory negligence. On June 4, 1895, there was a trial, and the jury, after hearing the pleadings, evidence, and arguments of counsel, and receiving a charge from the court, retired to deliberate as to their verdict, and, after due deliberation, returned and delivered into court the following verdict:

"New Orleans, June 4, 1895.

"We, the jury, find for the plaintiff in the sum of eighty-seven hundred dollars ($8,700). Isaac B. Ellis, Foreman."

On June 6, 1895, the defendant moved for a new trial, which motion came on for hearing on June 15, 1895, and was argued by counsel, when the court took time to consider. On November 15, 1895, the plaintiff died; and on the 26th of that month his testamentary executor, Walter Scott, on due motion and order of the court, became party plaintiff herein. On December 3, 1895, action on the motion for a new trial was announced, and judgment thereon entered as follows:

"On consideration, orally assigned, it is ordered that a new trial be granted herein, and that the verdict and judgment heretofore entered be annulled and set aside."

On December 17, 1895, the case was again called for trial, and was heard before a jury, during the progress of which the defendant made the following motion:

"On motion of E. A. O'Sullivan, city attorney, of counsel for defendant herein, made in the presence of the jury, the evidence both of the plaintiff and of the defendant having been closed, and the case submitted, suggesting to this honorable court that the evidence clearly shows that the plaintiff has absolutely failed to make out such a case as will entitle him to a verdict in his favor: (1) Because the evidence fully establishes the fact that the accident which befell the plaintiff happened in broad daylight, namely, at 1 o'clock p. m.; (2) that the evidence of the plaintiff himself shows that the obstruction which caused the injury was apparent: (3) that the first view of the obstruction that he could have obtained if desiring was from fifty to sixty feet distant from the obstruction; (4) that the obstruction, according to the evidence, was fully six inches above the level of the ground; (5) that the evidence of the plaintiff himself shows that there was nothing to prevent his having a full view of the obstruction; (6) that the plaintiff himself testified that, had he looked, he would have seen the obstruction; (7) that the whole testimony of the plaintiff clearly establishes the fact that he was guilty of contributory negligence in not using in an ordinary manner the senses which nature gave him; (8) that the evidence establishes the fact that the plaintiff was suffering, at the time of the accident, from no mental or physical disability which would prevent him seeing the inequality of the pavement. It is moved that the court does now instruct the jury, in view of the law and the evidence governing this case, to bring in a verdict in favor of the city of New Orleans, defendant herein."

Whereupon the court charged the jury as follows:

"Gentlemen of the Jury: Whenever, in a federal trial court, the judge, having heard all of the evidence on both sides, comes to the conclusion that all reasonable men would, from that evidence, come to the conclusion that either one party or the other is entitled to a verdict,—and, of course, it is for the judge to decide whether such proof has been made,—it becomes not only the right, but the duty, of the judge to direct the jury to find for either one side or the other, accordingly as the testimony shows. Of course, you are sworn to decide according to the law and the evidence. Ordinarily speaking, it is for you to pass upon the facts, and it is for the judge to pass upon the law; but when a condition of affairs arises, such as that which I have described, when the judge, acting on his sense of responsibility and official duty, comes to the conclusion that all reasonable men would, from the evidence submitted to them, reach a certain conclusion, then it is his duty to so charge the jury, and direct them to find accordingly. Therefore, in cases of this character, your responsibility is entirely covered, because, for instance, in this case this ruling of mine will be preserved by what is called a 'bill of exception'; and it will be made clearly manifest that you returned the verdict according to my direction, under what I understand to be the law of the case. If I am mistaken, of course, there is a higher tribunal which will correct my error. I wish to say to you that in a case of this kind, where the obstruction complained of is a plain and visible one, where, on the evidence of plaintiff himself, in broad daylight (it is true, upon a cloudy day), he strikes himself, and stumbles against the step, resulting from the difference in the levels of the sidewalks, when there was nothing to distract his attention, and when there was no crowd, and nothing going on which would distract his attention, and when this obstruction was more than 60 feet from the corner of this street, and when, therefore, he had abundant opportunity, if he had been looking in the direction in which he was walking, as men ordinarily look, to have seen this obstruction,—I say, in a case of that kind, in my judgment, he cannot recover; for while it is true that it is the duty of the city of New Orleans to maintain its sidewalks in a reasonably safe condition, so that pedestrians can

walk along those sidewalks without danger, it is also a duty incumbent upon every man, at all times, to use ordinary care for his own preservation. It is the duty of every man, under all circumstances, to use the senses which nature has given him for his self-preservation. Now, I say that where a man is not affected by any infirmity of sight or any other infirmity, and he is walking along the street, whether the weather was cloudy or not (the testimony here shows that it was cloudy), and there was nothing between him and the difference of this level, and where there was such an obstruction as is shown by the photographs, and where a man, for some reason or other, when there is nothing to distract his attention, goes and injures himself on that obstruction,—I say that he has failed to use ordinary care which it is incumbent upon every man to use. I have given a great deal of thought to this case. It was tried once before, and I kept it under advisement during vacation. It is a case in which, if it was possible to lawfully compensate this old gentleman for his sufferings and injuries, I would be glad to do so; but it is clear, in my opinion, that he cannot recover, and therefore I charge you that you must find a verdict in favor of the defendant."

In accordance with this instruction, there was a verdict for the defendant. During the progress of the trial, the plaintiff offered to introduce the testimony of Alexander K. Finley, Dr. F. V. Waring, Mrs. C. Z. Waring (wife of Dr. Waring), Richard Montgomery, Alexander Westholtz, L. Giovanni, Rufus Hill, and John Bland, for the purpose of showing that previous to February, 1895, many accidents, similar to the accident to Hellwig, had happened at the same place on Julia street, caused by the same obstruction that caused the fall of Hellwig, which offered testimony the court excluded.

Among the errors assigned are the following:

"(1) The court erred in overruling the motion of plaintiff to introduce testimony to prove that numerous other accidents, causing injuries to other persons, similar in character to the said accident to the said Hellwig, had happened at the same place on Julia street, and were caused by the same obstruction, before the said 13th of February, 1895." "(8) The court erred in granting the peremptory instruction asked for by the defendant, and in refusing to submit the case to the jury, with the instructions prayed for by the plaintiff. (9) The court erred in admitting in evidence, over the objection of the plaintiff, certain pictures or photographs alleged to be representations of the inequality in the sidewalk on Julia street, which caused the fall and fracture of the kneecap of said Louis Hellwig."

Of these, it is manifest that the one numbered 8 is controlling.

"Whether there is any evidence tending to prove the averments necessary to sustain a recovery is as much a question of law as whether the averments are good on general demurrer. What is evidence in the case, and whether, in all the testimony introduced, there is any evidence tending to support each of the necessary averments, are questions of law, to be addressed to the judge. * * * It is not discretionary with the trial judge, on a trial before a jury in the courts of the United States, to submit the case to the jury when the whole evidence introduced on the trial is legally insufficient to warrant a verdict for the plaintiff. * * * In the courts of the United States, trial judges may grant new trials whenever and as often as in their judgment it is necessary to do so, to mete out justice between the parties. Their action in granting or refusing new trials cannot be assigned as error. Because of their absolute discretion in this matter, which long experience has sanctioned and found to be wholesome, they may be indulged and sustained in the exercise of a liberal discretion, though it be a legal, as distinguished from an absolute, discretion, in deciding before a verdict that the proof will support only one verdict, and in directing the finding accordingly. They may well feel free to pursue this course, and should be encouraged to do so in all cases where, in their judgment, only one verdict should be permitted to stand. Such action, being subject to review, may be safely taken by the trial judge,

and will be in the interest of the economy of time and money to parties litigant and to the public." Southern Pac. Co. v. Burke, 9 C. C. A. 229, 243, 60 Fed. 704, 713.

In Railway Co. v. Ives, 144 U. S. 417, 12 Sup. Ct. 683, Mr. Justice Lamar reduced to a formula (which has received, as it deserves, general acceptance) the rule to guide trial judges in determining when the question of negligence or contributory negligence should be submitted to the jury. This rule was evidently in the mind of the trial judge at the time he gave the instruction in this case. It is expressed by Mr. Justice Lamar in the following language:

"When a given state of facts is such that reasonable men may fairly differ upon the question as to whether there was negligence or not, the determination of the matter is for the jury. It is only where the facts are such that all reasonable men must draw the same conclusion from them that the question of negligence is ever considered as one of law for the court."

As we view the record in this case, it seems that the negligence of the defendant, and its consequent liability, are conceded, unless it is relieved of liability by reason of the alleged contributory negligence of Hellwig. It appears that Hellwig was a man over 70 years of age at the time he received the injury, but was well preserved and in possession of all his natural faculties, to an extent not usually enjoyed by men at that advanced age. He had lived in the city of New Orleans 42 years. He was a dry-goods clerk. He was employed by the best firms in the city. His reputation as a salesman was good, and he had a large clientele. On account of his former military life, his attitude and walk were very erect. He was living at the time on St. Charles street, near Thalia. His testimony was taken by deposition, and admitted in evidence in this case. Reducing it from the questions and answers to narrative form, it is, substantially, that about 1 p. m., February 13, 1895, he walked up from Canal street, on the right-hand side of Camp street, until he reached Julia street, where he turned to the right, to go to St. Charles street; that he walked like any other man walks; that he had been for 10 blocks on a level, and, of course, was thinking of nothing obstructive; that, when he had gone 40 feet on Julia street, he stumbled, and had a very heavy fall; that he did not know at first what had caused him to stumble and fall, but, when others picked him up, he then for the first time saw that there was an abrupt inequality in the grade of the sidewalk at that point, the 40 feet which he had passed over being about 4 inches lower, up to the line where he fell, than the sidewalk beyond that line; that he had no recollection of having walked on that side of Julia street before this accident; that before that time his attention had never been called to any inequality or obstruction or unevenness on that part of Julia street; that on turning the corner of Camp street, and walking towards St. Charles street, he did not observe any obstruction or inequality in the sidewalk; that he was walking erect, with his eyes directed ahead of him, and did not suspect that there was any obstruction or inequality that would interrupt his progress, and the first intimation he had that there was such an obstruction was when he stumbled and fell. The

inequality in the sidewalk was in the shadow of a gallery that extended over it. The day was very dark and disagreeable. It was the day before we had the snow (unusual in New Orleans), and snow was, in the air. No other witness testifies to the incidents of the accident. There is some conflict in the testimony as to the extent and character of the inequality in the sidewalk. Hellwig puts the difference in the levels at 4 inches. A witness (Aubry Littlejohn) puts the mean elevation at 6 inches, taking the plane through the center. Alexander Finlay, introduced by the plaintiff, testified that he had taken the measures on the morning on which he was examined as a witness; that he made four or five measurements; that near the curb the difference was 6 inches. The discrepancy of the two banquettes diminished as it approached the center. At 3 feet from the curb, the difference was about 5 inches; then it went to 4¾ inches; and finally, about a little more than halfway from the curb to the house wall, it was 4⅜ inches. Near the curb, where the discrepancy is greatest, there stood a large post, which made it impracticable for any one to walk near the curb at that point. It is unnecessary to further narrate the evidence on this point. The evidence on the first trial having been substantially the same, a jury of 12 men presumed to be intelligent and impartial, guided by proper instruction from the court, found in effect, that Hellwig had not been grossly careless, nor contributed by his negligence to his injury, and expressly that the plaintiff was entitled to recover for his injury. When a motion for a new trial was presented and heard, the judge took time to consider. In our opinion, the case should have been submitted to the jury; and, because this was not done, the judgment of the circuit court must be reversed.

In view of another trial, we observe that the first error assigned is, in our judgment, well taken. The testimony offered should have been received.

Touching the ninth error assigned, the counsel for the plaintiff contends that the photographs should not have been admitted in evidence over objection, submitting, as the second ground for his contention, the following:

"I maintain, in the second place, that they were not admissible, for the still graver reason that they do not tell the story told by the human eye. The representation of an object which they give to the mind is one thing, while that given to the mind by the eye, in a case like this, is quite a different thing. In other words, the picture they made to the apprehension is not the picture of the obstruction in this case made to the mind by the eye. And the rationale of this is plain enough. There is little analogy between a photographic plate and the retina of the human eye, and hence, as common observation teaches us, the imaging capacity and the character of the imaging performance of the former afford no just criteria of the imaging capacity and performance of the latter. Let me illustrate: * * * An ancient manuscript, subjected to the analysis of a photographic plate, will yield up mysteries of inscription absolutely unsuspected by the eye. The skin of a human face, which under the microscopic inspection of a physician is smooth and absolutely free from eruption, under the pitiless revelation of a photographic plate may be found to be dense with the pustules of smallpox. Now, this wide difference between the imaging capacity of a photographic plate and the retina of the eye equally obtains as to the character of their imaging performance. We thus

find, for example, that the shadows of an object photographed (when they are cast in the direction of a camera immersed in a dimmer light than that prevailing beyond or immediately on the further side of the object from the camera) appear in the picture on the photographic plate much deeper than in the image of the same object reflected on the retina; thereby causing the image on the photographic plate to produce on the mind an impression of greater size, solidity, and obviousness in the object than that produced on the mind by the image of the object formed on the retina. How irrational, therefore, to measure the human eye by the same criteria of judgment that we measure the camera; and hence how unjust to hold the retina to the same capacity of imaging, and to imaging with the same depth of shadows and shades in the picture imaged, that the photograph is held to. The photograph gives the story told to (or the effigy made on) the photographic plate of the camera by the object. On the other hand, the picture the eye sees and communicates to the mind is the image the object makes on the retina. All that a man can be held to a responsibility for seeing, therefore, in respect to any particular object brought within his field of vision, is the image the object makes on his retina, and not the image it makes on the vastly more sensitized plate of the camera. Apply these conclusions to the facts in the present case: The evidence shows that the obstruction or inequality pictured by these photographs was under the shadow of a low gallery; that the camera used in taking the photographs was in front of the obstruction, in the direction of the corner of Julia street, and situated under the gallery, where the light was much dimmer than the light on the other side of the obstruction, shining down in a sharp, smiting way immediately on the other side of the obstruction, from the open sky, through a breach or interval in the roof of the gallery. The effect of that comparatively sharp, partial, and concentrated light immediately on the other side of the obstruction had the effect of casting a shadow on the side of the obstruction next the camera, which, as represented in the photograph, is so much deeper than that represented in the picture on the retina that the mind is thereby impressed with the idea of much greater size, solidity, and obviousness in the obstruction. In such a case, therefore, it would seem that the testimony in respect of the appearance of that obstruction, as given by its photograph, must be, to a certain extent, false testimony, and hence should not have been admitted in evidence."

We cannot concur fully in this view of the question, and hence hold that the court did not err in overruling the objection, and in considering the objection as going to the effect of the testimony, and not to its admissibility. There is, however, much force in the suggestions of the counsel, and touching the effect of this testimony the jury should be fully and carefully instructed, and warned against its liability to mislead.

We do not deem it necessary to notice the other errors assigned, as the issues they represent may not, and most probably will not, arise on another trial. The judgment of the circuit court is reversed, and the cause remanded, with directions to that court to award a new trial, and otherwise proceed in the case in accordance with the views expressed in this opinion.