## TEXAS & P. RY. CO. v. EASON.

### (Circuit Court of Appeals, Fifth Circuit. February 28, 1899.)

### No. 780.

1. RAILROADS—INJURY TO PERSON ON TRACK—FAILURE TO GIVE SIGNALS.

    The purpose of train signals, by bell or whistle, is to warn persons of the approach of the train, and the purpose of stopping a hand car proceeding on the track to look and listen, or of sending a flagman forward, is the same, and a failure to observe either of such precautions cannot be held the cause of an injury by a train to one who knew of its approach in time to have avoided the injury.

2. MASTER AND SERVANT—INJURY TO SERVANT—LIABILITY OF MASTER.

    A railroad company cannot be held liable for an injury to a section man, who, with others, was trying to lift a hand car from the track in front of an approaching train, and was struck by the train, merely because the foreman did not expressly direct him to let go of the hand car and save himself, when it does not appear that the men were acting by order of the foreman in attempting to remove the hand car.

3. TRIAL—DIRECTION OF VERDICT.

    When the evidence given at the trial, with all the inferences that the jury could justifiably draw from it, is insufficient to support a verdict for the plaintiff, it is the duty of the court to direct a verdict for the defendant.

4. APPEAL—REVIEW—REFUSAL TO DIRECT VERDICT.

    While the direction of a verdict is a matter resting in the legal discretion of the trial court, its action in refusing to direct a verdict is subject to review, where the evidence is before the appellate court.

In Error to the Circuit Court of the United States for the Northern District of Texas.

T. J. Freeman, for plaintiff in error.

Thos. D. Ross and H. M. Chapman, for defendant in error.

Before PARDEE and McCORMICK, Circuit Judges, and PARLANGE, District Judge.

McCORMICK, Circuit Judge. J. D. Eason, the defendant in error, sued the Texas & Pacific Railway Company, the plaintiff in error, to recover damages for injuries alleged to have been inflicted on him by the railway company through the negligence of its employés. He alleged that on the 30th of September, 1896, he, with others, was engaged as a section hand in repairing the defendant's track from Brazos station eastward a distance of several miles, and in the work he was under the direction and control of the defendant's foreman, William Wooten; that the foreman commanded him and the other section hands to board a hand car for the purpose of conveying them to the place of work, and that the foreman carelessly, recklessly, and with gross negligence caused the hand car to be propelled along the defendant's track, and around the sharp curves thereon, at a rapid rate of speed; that at a point about two miles east from Brazos station, and when the car was rounding a sharp curve on the track, the foreman sighted the defendant's west-bound train, which was approaching the car at a rapid rate of speed, and he commanded the plaintiff to stop the hand car; that, when the hand car was stopped, the foreman jumped off, and carelessly, recklessly, and without regard for the safety of the

plaintiff, commanded him and others to lift the car from the track; that the plaintiff, not seeing the near approach of the train, and not realizing any danger, as no bell had been rung nor whistle sounded, and relying on the section foreman to warn him in time to avoid danger, in obedience to the command of the foreman, was struggling with the hand car in an attempt, with others, to clear the track, when without warning from the servants of the defendant on the train, or from the section foreman, the plaintiff was struck by the defendant's engine and by the hand car with which said engine collided, and was thereby knocked a distance of 32 feet, and wounded, bruised, and injured severely; that the defendant's servants conducted, managed, and propelled the train in a reckless, careless, and negligent manner, and failed to ring the bell or blow the whistle at a public crossing, which was about 100 yards from the place of collision, and propelled the train around the sharp curve without sounding the whistle or ringing the bell, at a rate of speed equal to 12 miles an hour; that the foreman caused the hand car to be propelled at a rapid rate of speed along the track around the sharp curves, and failed to send forward a flagman on approaching the sharp curves, as was the custom on the road, and failed to stop the hand car on approaching the curve, and listen for the approaching train, which could and would have been heard had the hand car been stopped; that the foreman had theretofore admonished the plaintiff for his haste in what he termed unnecessary hurry in lifting the hand car from the track to avoid collision with a train, and on many such occasions had told the plaintiff not to be in fear, as he would always have ample time to get the hand car off the track; and that by these and other expressions and conduct of the foreman the plaintiff, who was inexperienced, had been induced and persuaded to trust to the guidance of the foreman, who was an old railroad hand, with much experience; and that the said careless, reckless, and grossly negligent acts and omissions of the foreman caused the collision of the hand car with the train, and caused the plaintiff's injuries, to his great damage, for which he prayed judgment. The defendant submitted a general demurrer, and pleaded the general issue, and that the plaintiff was guilty of contributory negligence, which proximately caused his injury, in this; that he saw, or might have seen, the approaching engine in time to have gotten out of its way, but he negligently failed to do so. The case was submitted to a jury, and there was a verdict and judgment for the plaintiff.

When the proof was all in, the defendant requested the court to charge the jury to return a verdict for the defendant, which request was refused, and this ruling is assigned as the first ground of error for which the judgment of the circuit court is sought to be reversed.

The plaintiff, on the witness stand, testified as follows:

"On the morning this injury occurred, the foreman commanded us to go to work, and we got on a hand car at Brazos station. Our work was east of Brazos station. We went between one and two miles, when we came to a sharp curve, and were running along. The foreman bid me throw on brakes, and I did so. He did not say what for, but just called for brakes. I put on the brakes, and before I got off the car—there were two men behind me—I turned my head, and saw them pick up the end of the car, and start

around, and I supposed there was something up then. I got off, and took hold. I think I helped get the car off. We got it around—about half around. That is about all I know. I never knew whether we got the car off. I cannot state the reason. I don't know myself. I never knew anything for about four days afterwards. That was on Wednesday, and it was about Sunday before I knew anything. The accident occurred about a mile and a half east of Brazos. The cut is just a little limestone cut about six or ten feet deep. As well as I can guess, it is about one hundred and fifty yards long. The road curves to the south going east. As well as I can guess, it is about one hundred and fifty yards—may be a little further—from the point where it begins to curve and turns south back to where it changes and starts east again. From the east end of that curve the track is straight for something like half a mile. Then it curves north through another cut. There is a public crossing at the east end of the cut. The hand car had gotten something near one-third of the way in that cut when it collided with the train. The whole length of the cut is about one hundred and fifty yards, and I suppose we were fifty yards in the cut, to the best of my recollection. I was on the southeast corner of the car when we left Brazos, and was in the same place when the brake signal was given by the foreman. I was on the front of the car, on the south side of that end. The foreman was on the northeast corner. There were four of us in all. The other two men were at the hind wheels. I was at the brake. We did not stop when we approached this curve. No one was sent forward to see whether or not a train was approaching from the direction in which we were going. I heard no whistle or bell from a train. An approaching train could be seen sooner from the northeast side of the car than from the position occupied by me. The curve was south. The command to put on brakes was given this way: 'Sh-e-e-e-e-e!' It was understood that that was a call for brakes. That was his way of calling for brakes. The best I can tell, the hand car went about half a length of a rail before it stopped after I applied the brakes. We cannot stop a hand car very readily when it is loaded and under headway. We had on that car that morning a lot of tools, and a keg of water, besides the men. The car had not entirely stopped when I saw these men take hold of it at the rear end. Mr. Wood and Mr. Hooper were the men who were with us, and took hold of the rear end. The foreman went back, and took hold with them. I got off then, and took hold of the corner I was on, to help them off with it. When they took hold of the rear end of the car we moved it north. We just got the car around square across the track when the collision occurred. We got the rear wheels off. That threw the front end south. The wheels were about the center of the track. It rolled until the wheels got against the north rails. I was at the northeast [southeast] corner of the car when it started, and when it got square that threw me on the west [southwest] corner. I was trying to help them get the car off. I didn't think of any danger. Didn't know there was any danger near. I don't remember that the foreman gave me any instructions that there was a train coming. It sort of seems like he remarked, 'Let's get her off, boys; yonder comes a train.' It sort of runs in my mind that he said that. I expected him, if there was any danger, to give me warning. I thought that if it was anyways close he would tell us. There is another cut there. It is called 'Nigger Hill.' It is about a half mile from this cut where I was hurt. I had been in the employ of the company about seven months, in the capacity of section hand, under this same foreman. Generally, when there was a train approaching, when we would go to take the hand car off, he would caution us not to get in a hurry,—'Don't be too fast; you have plenty of time.' He spoke it very abruptly. He seemed like he got mad because we got in a hurry. He would tell us not to be too fast; that there was plenty of time. They were on the north side, and I was between the rails, assisting in taking off the car. If he had warned me, I could have jumped back off the track out of the way. No warning was given, that I heard, at all. The foreman was very abrupt, and if a man didn't do to suit him he talked very abrupt, and threatened to 'fire' him. If that hand car had been stopped before entering that cut, we could have heard a train approaching. There was no precaution taken to see whether there was a train approaching or not. I don't know exactly what time we

left Brazos that morning, but from what they told me I suppose it was about 6:30, probably a little later. I think it was earlier than the usual hour. I don't know the time myself; I was on his orders; but from what they told me it was ahead of time. That was a freight train. I don't know at what rate of speed they were running. The whistle could have been heard at that road crossing very distinctly, and the bell could by a person not on the hand car. If the hand car is loaded with tools, it makes a racket,—the shovels, picks, and bars jolt, and make a racket." Being asked, "What were the regulations about sending some one of your men ahead around these curves to see whether there was a train approaching or not?" The plaintiff said: "We listened to see if there was one coming. If the wind was still, we could hear a train a mile. It depended on how high the wind was blowing as to how far we could hear a train. We could hear one far enough, even in the cut, to get a car off the track before it got there. There was no other precaution taken to ascertain whether there was a train coming or not, that I know of. We did not stop the car the morning of this accident."

### On cross-examination the witness said:

"I cannot tell the rate of speed the hand car was going the morning I was hurt. We were just going at a moderate gait. I don't know how many miles an hour; I never timed it. The nearest I ever came to getting the speed was once we run seven miles in thirty minutes. We were running very fast. The morning of the accident I suppose we were running four or five miles an hour. At the east end of the curve is a public crossing. I call it a public crossing. It was where wagons and buggies cross. It was not a county road, that I know of. It was a settlement road, where everybody on the south side crossed. It was in Palo Pinto county. I never did see the engine that struck me. I had my attention called to the brake, and I was trying to get the car off. The foreman called for brakes, of course, and I put on brakes. He called for brakes this way: 'Sh-e-e-e-e.' I understood what that meant. I understood it was for brakes. I had no idea what it was for. I didn't look to see if there was any danger. I didn't know what he was stopping for at that moment. I saw the men on the rear end of the car get off, and pick up the back end of the car, and start around. I had an idea that there was a train coming. I was on the south side of the track, and couldn't see as far up the track as they could,—as the men on the north side could. There were two men on the west end of the car, but they were nearer the center than I was. I was right on the edge. I had no warning of the approaching train, except, it seems like, as he started back towards the end, he said, 'Let's take her off; yonder comes a train.' I wouldn't say positively, but it just seems like a dream now. Q. Are you testifying from facts or dreams? I just testify the way it seems to me. Yes, sir; I have thought of that before I come here to-day. It was after he called for brakes that he said that, 'Let's take her off.' It was after he got off, and started back, he said that. The other men got out of the way of the engine. We were not engaged long in trying to get the car off the track. If I hadn't taken the time to get the car off, it wouldn't have taken more than a second or two to jump off on the south side. I did not see anything at all to indicate danger. I didn't look up to see a train or an engine. I was watching my foot to keep it on the brake. Sometimes you have to place your foot in a particular way to keep it on. The brake lever is narrow, and you have to watch what you are doing, or your foot will slip off sometimes. I turn my foot crossways with the hollow of my foot on it. I could not look up and down, too. That would be impossible. It looks that way to me. I never did see that train at all. Never have seen it. Since then I have seen what they told me was the same train. I had my foot on the brake. I had been pulling the car. I didn't stand. At that time I didn't know that that was a place of danger. I knew there was danger, of course, but I didn't know the train was so close. I supposed it was coming, from the actions of the other men, but I didn't know it was so close. I couldn't look ahead and attend to my business too. I had been setting the brake for some time. It [the hand car] had only one brake. * * * I had sense enough to know an engine when I saw it coming down the road ahead of me. I could have

gotten out of the way if I had known it was close to me. I didn't have time to investigate anything. * * * I had been in the service of the company about seven months that time. I had worked for them twice before that,—about six months one time, and something over three months another time. Altogether, I had been in the service of the company about sixteen months. I was nothing like an expert. I was just a common section hand. Yes, I had met freight trains before during my sixteen months' service. I met trains several times, but we always got the hand car off in time. Never did get a hand car struck before, when I was with them. I did not say the section boss always stopped the car, and sent a man ahead, until that time. I said he sometimes stopped and listened, and sometimes he would not. I knew sometimes he didn't stop. Certainly, we took the risk if he didn't stop and listen to see if there was a train coming. I knew there was a train somewhere on the way, but didn't know how far or how near. I knew it was somewhere west of Ft. Worth."

### On redirect examination the plaintiff said:

"When we were trying to get the hand car off the track, I thought sure the foreman would warn me if there was any danger. I was right on the south edge of the car, and I put my foot on the brake, and stopped the car. There was just room enough to stand on the car and work the lever. I don't know the width of a hand car. I never measured one. The side of the car is inside the wheels. The car is about the width of the track. From the position I was in, I couldn't see a train in the cut more than seventy-five yards if I had looked. I might have seen the smoke at that distance if I had looked, but I couldn't have seen the train. In taking the hand car off, it is necessary to have some one at the front end. It makes it lighter on them. If the foreman had given me warning, I could have gotten off,—could have stepped right back off the track. There was no warning given me that I heard. The other men were on the north side of the track, and at the end of the car, and I was at the southwest corner of the car. I don't know how far I was knocked. I don't know how many times the foreman had told me, when he went to take a hand car off the track for a train to pass, not to be in too great a hurry; that we had plenty of time. He told me that several times."

### Recross-examined, he said:

"I never did measure that cut to see how deep it is. I suppose it is between six and ten feet. It is highest near the center of the cut, as well as I remember. I suppose the bed of the hand car is twelve or eighteen inches above the track. I was standing on the top of the hand car. I am something over five feet; I don't remember. That would make me six or seven feet above the track. I don't know how high a smokestack is above the ground."

### Again, on redirect examination:

"It is generally downgrade all through the cut, and on down to the bridge. The bridge is about a half mile, I suppose. It is gradual downgrade to the west. It is not a steep grade. The downgrade begins about half a mile east of the cut. From half a mile east of where we were, down to the bridge, is downgrade. We were going upgrade, and the train was going downgrade."

H. B. Hooper, one of the section hands who was on the car, testified:

"It was in a short curve where the accident occurred. The track curves to the southeast; and if a man was standing up on the hand car he could see the smokestack of a train about five hundred feet. It was very seldom that the section boss sent a flagman. Sometimes he did, and sometimes he didn't. We left the depot at 6:50, and went at the rate of six miles an hour. Don't remember that the foreman gave any orders as to going fast or slow. Don't know what speed of a train was directed by the company around a curve. Don't know what speed the train makes, but not so fast as on a

straight track. The train was stopping before I noticed how fast it was going. I heard neither bell nor whistle. There is a public crossing a short distance east of where the accident occurred. I didn't hear bell nor whistle at the crossing. My idea at the time was that the engine was about two hundred feet from the hand car when I first saw it. Wooten, the foreman, whistled for brakes. This was his usual signal. The plaintiff was helping to get the hand car off the track. The foreman was helping to get the car off, too. No orders were given to Eason to desist from his attempt to get the car off before he was hurt, except I called, 'Look out!' * * * We stopped as quick as we could when we saw the train coming, and tried to get the car off. Don't know what part of the car Eason was at when hit. Can't say what position he was in with reference to the car, nor what he was doing with his hands. The hand car was going east; the locomotive going west. A train can be seen about five hundred feet east and a mile west from the place of the accident. The bank on the south of the curve prevented the train from being seen. If we had stopped to listen, we could have gotten out of the way,—could have heard the train. I didn't hear it until I saw it. I got out of the way. I was not hurt. Don't know what hindered Eason from getting out of the way. Don't know what orders are given about running trains."

A. Wood, the other section hand who was on the hand car at the time of the accident, testified:

"The accident occurred about a mile and a quarter east of the station or depot at Brazos. We were working on the section as section hands. William Wooten was the foreman. We started to work that morning at 6:50 a. m., from the depot. Did not use the section house. At the place of the accident the track was curved, and in a cut. After leaving the curve a few hundred yards, the track is straight. Don't know just how far a train can be seen east from the place of the accident. There were no precautions usually taken by the foreman to avoid collision with defendant's locomotives. We left the depot at 6:50 a. m., and were going about five or six miles an hour. The foreman gave no orders as to speed. Don't know the company's orders as to speed of trains at this point, nor what speed they ordinarily make. The train ran its length and two rails before it stopped, after striking the hand car. I don't remember of hearing either bell or whistle. There is a crossing just east of the place where the accident occurred. Didn't hear any bell or whistle there. I think I saw the engine three hundred feet before it struck the hand car. There were no orders given in reference to the hand car, that I remember. The foreman was trying to get the car off, and I was helping. Eason was trying to get the car off the track. The foreman was helping. I didn't hear any orders to Eason to desist from getting the car off the track just before the accident. * * * We could have heard the train if we had stopped and listened at the right time. I got out of the way. I was not hurt. I was at the end of the car that was off the track, and Eason at the end between the rails. When the foreman saw the train, he gave Eason signal to put on brakes of the hand car. I saw the train. You could see a train west a mile and a quarter. I don't know how far east one could be seen. The curve and cut would prevent a train from being seen from the east. I don't know about the train orders at that or any other point."

I. M. Dean, a witness for the defendant, testified:

"I am an engineer of the Texas & Pacific Railway Company. Have been a locomotive engineer for fourteen years. I went to work for the T. & P. in 1882. I was on the engine that hurt this plaintiff. I was going west. It was a freight train. I think we had about twenty cars; some empty and some loaded. My best recollection is that we had about twenty cars in that train. We never know on the front end what the cars are loaded with. We were going downgrade for about two miles,—a mile and a half or two miles. It was a rather sharp curve. I don't know the degrees. I suppose I was eight or nine hundred feet when I saw him first. That is a rough guess. I suppose I saw the other section hands. No, I didn't give any signals for

that curve. I didn't ring the bell for that curve. I whistled for the crossing, and the brakeman was ringing the bell. That was the first thing that had my attention. I don't know how far I was from the crossing when I whistled. The brakeman reached up and pulled the bell cord, and looked at me, and I looked out the window, and saw the hand car. The brakeman kept ringing the bell until we hit the car. I did what I thought was right to stop the train. I was afraid the hand car might strip the engine and throw the rods through the cab, and that is very dangerous. I didn't call for brakes. I set the air. I didn't have air brakes on all the cars. I don't know how many cars had air. They [the persons on the hand car] must have seen me first, for they were taking the car off the track when I saw them. When I leaned out of the window, they were taking the car off the track, or trying to. The pilot struck it. He was a little nearer the north rail than the center of the track. He was between the center and the north rail. His side was to me—his right side. He had his face to the north. Pickens was my brakeman. I don't know where he is. I thing he is on the road. He is running a train now. I am sure he rang the bell, and I whistled for the crossing. I was sitting there, looking straight ahead, and he pulled the bell cord, and looked at me, and I knew there was something. I could not possibly have stopped that train before I struck him. I think the caboose stopped about where the man lay. I didn't get out of the cab until we got to Brazos. I saw them take him, and put him on the caboose. I don't know what rate of speed we were running. I don't think over fifteen or sixteen miles an hour. I couldn't have stopped the train any sooner than I did."

## On cross-examination he said:

"I sounded the whistle, and the brakeman rang the bell. I don't know the distance from that cut. It is quite a way from the crossing. It must have been between a quarter and a half mile. I whistled just after I came around the curve at the top of the hill. I had just passed out of the curve when I sounded the whistle. The time-card says, 'Give the signal at eighty rods from a crossing.' I guess I was over eighty rods. I had to lean out of my cab window to see this hand car. I think we were further than four or five hundred feet from it when I first saw it. I was a little excited. The car stood across the track, and it was liable to ditch the engine. I thought my life was in danger. I never thought for a minute about the section men being struck. I thought I might run into the hand car, and that there was danger of a derailment. I thought they would get off. I have seen cars taken off much nearer that that, and no one hurt. I didn't blow the whistle again. I set the brake, and was trying to stop. I first made an ordinary application of the air, and then I applied the emergency air. I was on the north side of the cab. The nearer I got, the plainer I could see. The front of the engine did not obstruct my view. He was trying to get the car off the track. He was in a stooping position. The other men stepped off just before I struck him. I didn't see anything in the world to keep him from stepping off the same as the other men did,—he wasn't fastened there. I don't think I can stand in front of a train and tell the speed it is coming at. I could tell whether it was coming fast or not. I don't know how far I missed the section boss, —not much. He got off. I guess I was forty or fifty feet from him when he got off. I was not running fifteen miles an hour when I struck him. I don't think I was running over ten miles. That would be about fourteen feet every second. The train ran about its length after it struck the hand car. I didn't get off the engine. I saw them put him in the car. The bell was ringing, and I was afraid that if I sounded the whistle they might get off the track, and leave the car there. I didn't want to endanger my life. I don't think the car was ever moved after I saw it. I was certainly interested in getting that car off of there. I wouldn't like to see any man hurt. They knew I was coming. That is the reason they were taking the car off the track. The bell was ringing. This accident occurred two minutes after seven o'clock. I looked at my watch as soon as we stopped. We are supposed to look out for hand cars at all times. It was my understanding that that was about the time they usually went to work. I supposed the whistle was sounded enough for the curve. I sounded the whistle back half a mile.

I don't know why I didn't sound it again when I came near that curve. We can't sound a whistle for every curve in the road. It would take all the steam we have. We have plenty of such curves as that. Yes, sir; it is usual for us to keep a lookout for section gangs, and they keep a lookout for us. I think they saw the engine long before I saw them."

### On redirect examination:

"I don't know how high an engine is from the track. I suppose fifteen feet to the top of the smokestack. It is quite a little distance. We have no instruction in the world about looking out for section men. We are supposed to look out for hand cars. We have no instruction to look out for men walking the track. The time-card says they are supposed to look out for us. The time-card provides that bridge and section men are to look out for trains."

### Recross-examination:

"This was a dewy morning, as well as I remember. The sun was just rising."

The foregoing embraces all of the testimony that was offered on the issue as to the defendant's negligence. The plaintiff testified that he knew before the hand car started that the train was coming, and that the foreman signaled him to apply the brakes in time for him to stop the car and get off to the ground, which he did in ample time to step off the track, and keep out of the way of the train. While he says that he did not see the train himself, he says that he knew from the signal for brakes, and the action of others on the hand car, that the train was there. The other section men who were on the hand car, and whom he called as witnesses, testified that they saw the train. One of them (Wood) said: "I think I saw the engine three hundred feet before it struck the hand car. There were no orders given in reference to the hand car, that I remember." The other (Hooper) said: "My idea at the time was that the engine was about two hundred feet from the hand car when I first saw it." This witness also says: "No orders were given to Eason to desist from his attempt to get the car off before he was hurt, except I called 'Look out!'" The purpose of giving signals, by bell or, whistle, of the approach of a train is to warn persons leaving the track or on it, or about to get on it, of the fact that the train is approaching; the purpose of stopping a hand car, that those on it may listen and hear the noise of an approaching train, and the purpose of sending a flagman forward at cuts and curves, which seem to require such precaution, is to warn those on the hand car that the train is coming. But persons who know that the train is coming, and who see it in time to get off the track, or who know it is there in time to get off the track, have the best warning, and do not need and could not be benefited by any kind or amount of previous warning. The testimony of one's own senses in their normal condition is the best evidence of such a fact. Therefore this testimony of the plaintiff, and the undisputed testimony of the witnesses he called, takes wholly from our consideration in this case any question as to the alleged negligence of the servants of the defendant who were in charge of the train, and of the negligence of the section foreman prior and up to the time when he and the section hands who were with him got off the hand car and on the

ground in time to get themselves off the track before the train reached the spot where the hand car was stopped.

The only remaining question is, was the section foreman negligent in not giving the plaintiff an express order to desist from his effort to assist in getting the hand car off the track, and to get himself out of the way? The plaintiff, in his testimony, does not claim that the section boss gave him any direct order to assist in getting the hand car out of the way. He says only, "It seems to me like a dream that I heard the boss say, 'Let's get her off, boys; yonder comes a train.'" It was the duty of the "boys" and of the foreman to "get her off" if they could with safety to themselves. That was, doubtless, the first idea in the mind of the plaintiff, and the inspiration of his "dream"; for the other section hands who were not struck do not testify to having heard it, and they doubtless would have so testified if they had heard it. Wood says expressly that no orders were given, that he remembers. They all did attempt to take the car off. The other three let go, and stepped out of the way in time to escape injury. The plaintiff failed to do this, and was badly hurt. He had been in the service of the railroad for periods aggregating 16 months. Immediately before this time he had been engaged on this section of the road, and under this section foreman, for a period of seven months. For some time previously it had been a part of his work to set the brakes on the hand car. He did that duty well on this occasion. After hearing the foreman signal, he stopped the hand car almost immediately, before it advanced more than half the length of a rail. He was 36 years old. He says that he was tolerably stout and healthy. He says further: "If the foreman had given me warning, I could have gotten off. I could have stepped right back off the track." And again: "If I hadn't taken time to get the car off, it wouldn't have taken me more than a second or two to jump off on the south side." The manner and direction in which the hand car was moved made it easier for those who were at the rear end to keep themselves clear of the track than it was for the plaintiff, who was at the front end. But it is clear, from his own testimony, that there would have been no difficulty in his getting out of the way of the train, if he had tried to do so. His personal conditions and the time and opportunity were ample for this purpose.

It thus appears that the only negligence he can impute to the defendant company is the failure of the foreman to direct him expressly to let the hand car go, and to get himself out of the way. We think the obligation of the company does not go to the extent of requiring it to furnish that degree of attention to the safety of its employés. Their safety would not be promoted by substituting the judgment of the foreman for the judgment of each individual under him as to the time and means of escaping a manifest peril. Such a rule would be utterly impracticable, and therefore it cannot be required that the defendant should in that manner guard its employés against those dangers of which the employé can equally or better take notice, and can best guard himself. In some instances, where

92 F.—36

the master, or an agent of a corporation who stands in the place of a master, gives an express order to an employé to do an act that requires him to incur imminent hazard, the servant will be justified in submitting to the authority of the master, because he is presumed to have superior experience and judgment, as well as to occupy a superior position; and, as between the servant and the master touching the duty of the one and the liability of the other, the servant may yield his own judgment to that of his superior. In such a case the habit of obedience to orders—so necessary for the efficient conduct of all important operations—naturally checks the instant exercise of individual judgment in the employé. Railway Co. v. Duvall, 12 Tex. Civ. App. 348, 35 S. W. 699. In this case there is no evidence tending to show the giving of such a command, expressly or by implication. The conditions are not made more favorable for the plaintiff's claim by reason of the fact—conceding it fully to be a fact—that the foreman had on previous occasions, when taking a hand car off out of the way of an approaching train, cautioned the hands not to get in a hurry, not to be too fast, that they had plenty of time, even though he spoke it "abruptly, and seemed like he got mad because the hands got in a hurry," and had, as the plaintiff says in his petition, admonished the plaintiff for his haste, and for what the foreman termed unnecessary hurry in lifting the hand car from the track, or had on many such occasions told the the plaintiff not to be in fear, as he would always have ample time to get the hand car off the track. Such admonitions were both wise and kind, even if, in the exigency in which they were given, they were accompanied with an emphasis of manner which the plaintiff calls abrupt. The agitation of fear disturbs the judgment, and unnecessary and improper "hurry does not make haste." The giving of such admonitions to the section hands did not express or imply a command, or even advice, to them to wait for the word from the foreman before looking out for their own safety. On the contrary, it assumes that on all such occasions each person must take care for himself; and on this occasion the foreman had a right to presume that the plaintiff, who had full knowledge that the train was there, and the danger impending, would look to his own safety, and get out of the way in time to escape injury. We conclude that there is no proof in this case from which a jury of reasonable men, properly instructed, could find, by inference or otherwise, that the injury received by the plaintiff was caused, directly or proximately, by the negligence of the defendant or of its servants.

We do not discuss here any question touching the doctrine of fellow servants, either as matter of general law or as affected by the local statute, because, for all the purposes of this case and of our present argument, it may be conceded that the section foreman, in all of his relations to the plaintiff's injury, represented fully the defendant; so to speak, was the defendant. Still, in our view of the law, there is in this case no evidence tending to show on the part of the foreman any negligence that was the direct or proximate cause of the injury to the plaintiff.

It has been said by the supreme court that:

"Decided cases may be found where it is held that, if there is a scintilla of evidence in support of a case, the judge is bound to leave it to the jury; but the modern decisions have established a more reasonable rule, to wit, that, before the evidence is left to the jury, there is or may be in every case a preliminary question for the judge,—not whether there is literally no evidence, but whether there is any upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the burden of proof is imposed." Commissioners v. Clark, 94 U. S. 278.

In a later case the supreme court say:

"It is the settled law of this court that when the evidence given at the trial, with all inferences that the jury could justifiably draw from it, is insufficient to support a verdict for the plaintiff, so that such a verdict, if returned, must be set aside, the court is not bound to submit the case to the jury, but may direct a verdict for the defendant. And it has recently been decided by the house of lords, upon careful consideration of the previous cases in England, that it is for the judge to say whether any facts have been established by sufficient evidence from which negligence can be reasonably and legitimately inferred; and it is for the jury to say whether, from those facts, when submitted to them, negligence ought to be inferred." Randall v. Railroad Co., 109 U. S. 478, 3 Sup. Ct. 322.

In each of the cases just cited the trial judge had withdrawn issues from the jury by a peremptory instruction, and his action was affirmed by the supreme court.

In Southern Pac. Co. v. Burke, 23 U. S. App. 1, 9 C. C. A. 229, and 60 Fed. 704, we remarked that the language bearing on this subject, so often cited with emphasis, is found in opinions affirming the ruling of the trial judge, or reversing his decision when he had improperly withdrawn the case from the jury; that of the great number of cases in which the question had been raised before the supreme court we then found only two which had been reversed, in which the trial judge had refused to withdraw the case from the jury. These two were Steamship Co. v. Merchant, 133 U. S. 375, 10 Sup. Ct. 397, and Armour v. Hahn, 111 U. S. 313, 4 Sup. Ct. 433. Further on in our opinion we noticed at considerable length the reasons which, in our judgment, should induce trial judges to indulge in the exercise of a liberal discretion in deciding before verdict that the proof in the case on trial will support only one conclusion, and directing the jury to find accordingly; and that, while this discretion is a legal one, and is the subject of review, appellate courts ought, as far as may be, to sustain its exercise.

In Railroad Co. v. Thomas, 23 U. S. App. 37, 9 C. C. A. 29, and 60 Fed. 379, we used this language:

"We are constrained to hold that the provision of our constitution which gives parties to an action at law the right to a trial by jury embraces even parties who bring actions at law against railroad corporations, and that the persistent effort to push precedents to the point of requiring trial judges to decide as questions of law the issues most commonly joined in cases where the recovery for personal injuries is sought should not be encouraged."

In Railway Co. v. Patton, 23 U. S. App. 319, 9 C. C. A. 487, and 61 Fed. 259, we used this language:

"The exception to the charge of the court and to the refusal of the requested charge having served to bring up in the bill of exceptions a full statement of all the evidence given on the trial, it appears from the face of the record that there was no evidence to sustain the judgment of the circuit court. It is thus manifestly erroneous, and must be reversed."

In Southern Pac. Co. v. Johnson's Adm'x, 44 U. S. App. 1, 16 C. C. A. 317, and 69 Fed. 559, in which Mr. Justice McKenna (then senior circuit judge) presided, and concurred in the judgment, the case was reversed upon the ground of the insufficiency of the evidence as contained in the bill of exceptions to justify the court in submitting the case to the jury at all; the circuit court of appeals for the Ninth circuit saying:

"We think, upon the evidence as presented in the record, that the judge should have instructed the jury to find a verdict for the defendant. The judgment of the circuit court is therefore reversed."

In Southern Pac. Co. v. Burke, supra, the senior circuit judge, in a dissenting opinion, said:

"I do not understand that my views of the law in regard to the respective provinces of the trial judge and the jury are at all out of accord with those of the supreme court, or that I differ with my associates in this court except with regard to the application of the conceded rules on the subject. What I insist upon is that where, under the law, the duty of the trial judge is to direct a verdict, this court, in reviewing the case properly shown by the record, should meet the full measure of its responsibilities, and that in such a case it is not sufficient to fall back on the trial judge's opinion as conclusive that reasonable men may fairly differ as to the effect of the undisputed evidence in the case; and in this connection it is proper to say that the observations of the court as to the frequency of personal injury suits, the skill and acumen with which each side is presented, the what used to be called champerty prevailing at the bar, and the general surroundings on the trial of such cases,—all, it is intimated, creating an atmosphere of prejudice above which the trial judge may not always rise,—instead of being an argument in favor of giving great weight to the ruling of the trial judge, who is frequently called upon to act on the spur of the moment, without sufficient opportunity to analyze and fully weigh the testimony, rather point the other way, and really furnish a strong reason, if one is necessary, why this court should look well into every properly presented case of complaint, and see that the trial judge neither trenches on the legitimate province of the jury, nor mistakes nor neglects nor abdicates his duty as judge to the prejudice of the parties."

Though this language is in a dissenting opinion, the conclusion which it announced does not differ from the views entertained by the court as then constituted, and that conclusion has always been concurred in by this court.

We deem it unnecessary to notice any of the questions raised by the other assignment of error. The views we have already expressed will indicate to the circuit court the action proper to be taken on such questions as will probably arise on a new trial. Holding that the trial judge should have instructed the jury to return a verdict for the defendant, the judgment of the circuit court is reversed, and the cause is remanded to that court, with direction to award the defendant a new trial.