GEORGE R. HUNGERFORD *vs.* CHICAGO, MILWAUKEE & ST. PAUL RAILWAY COMPANY.

October 2, 1889.

**Master and Servant—Dangerous Appliances.**—Testimony as presented by the settled case examined, and *held* to justify the verdict, under the rules laid down in *Russell* v. *Minn. & St. Louis Ry. Co.*, 32 Minn. 230, and other cases.

Appeal by defendant from an order of the district court for Mower county, *Farmer, J.*, presiding, refusing a new trial after verdict of $1,100 for plaintiff.

*Kingsley & Shepherd*, for appellant.

*French & Wright, Lovely & Morgan*, and *Walter J. Trask*, for respondent.

COLLINS, J. The defendant herein moved for a new trial upon the sole ground that the verdict was not justified by the evidence. From an order refusing to grant the motion an appeal is taken.

In the fall of 1887 plaintiff was employed by the defendant for a few days as head brakeman upon one of its freight trains. Prior to this he was wholly without actual experience as a brakeman, although he had obtained some knowledge of the duties by observing others while they were engaged in that kind of work. After a few days' absence from the road, he was again employed for the same service, and a few minutes afterwards, while attempting his first coupling, lost the forefinger of his right hand. This action was brought to recover damages for the loss. The coupling which plaintiff endeavored to make was that between the locomotive and the train, which consisted of box-cars, provided with the common coupler or draft-iron, and a caboose, the latter in the rear. The locomotive had previously been fitted up for passenger train service, with a so-called "goose-neck" draft-iron. This goose-neck is a large casting, bolted upon the rear of the tender in place of the ordinary draft-iron, and its name suggests its form and shape. It projects above, and its face or end service, which is 7 by 12 inches, is beyond or further to

the rear than is the face or end of the draft-iron usually found upon freight locomotives; so far, in fact, that, whenever a locomotive so equipped is brought up with but slight force for coupling to a freight-car, the end of the neck passes over the iron upon the car and strikes the dead-wood always found just above it, thus inevitably crushing any susceptible object which may be between the end surface of the neck and the wood upon the car.   The plaintiff rode upon the tender, evidently in close proximity to the coupling appliance of which he now complains, and in the middle pocket of which he saw a link, through two switches.   As the locomotive backed down to the train he took a coupling-pin, walked to the car, closely followed by the locomotive, and, when it came back upon him, stood holding the pin above the draft-iron of the car, in the usual, proper, and ordinarily safe position for making the connection had a common iron been upon the tender, instead of the goose-neck.   As it was, his manner turned out to be unsafe and dangerous, for the pin and part of his hand were caught between the end of the neck and the dead-wood, causing the injury for which he claims damages.   It seems to be admitted that, had an engine of the customary pattern for the freight service been used, plaintiff would not have been injured, for he was attempting the task in the usual way; and it is also admitted that had he been instructed as to the proper manner of coupling under such circumstances, or had he been accustomed to the goose-neck in combination with the freight-car, he would have changed the link from the tender to the car before they came together, or, as the former approached, would have directed the link in the goose-neck into its place in the draft-iron upon the car, completing the coupling, in either case, by dropping the pin from above through an aperture in the neck.   This style of draft-iron is of no value whatever upon a freight engine, is rarely found upon one, and where so used is manifestly much more dangerous than the iron with which such engines are commonly supplied.   It was designed expressly for passenger trains, to be used in connection with the Miller coupler and buffer universally found in the passenger service of the present day.   A locomotive with such a draft-iron can be readily coupled from the platform of the baggage car or passenger coach, and, when in place upon the

train, the end surface of the neck rests snugly against the buffer of the car. Its office is to take up the slack or play between the loco-motive and the car, to prevent jerking, and thus, in connection with the before-mentioned coupler and buffer, to make what is known in railway parlance as a "solid train."

The rules of law by which this case must be governed have so often been declared by this court that they need not be repeated at length on this occasion. The plaintiff, when entering into defendant's serv-ice as a brakeman on one of its freight trains, took upon himself only those risks which were naturally and ordinarily incident to his em-ployment, or which, from the facts before him, it was his duty to in-fer, and such risks, also, as might be announced to him as occasion required, and which he thereafter assumed. If defective instrumen-talities were furnished for his use, he must not only have known or ought to have known their actual character and condition, but to have understood, or by the exercise of ordinary observation to have real-ized, the risks to which he was exposed by their use. This has been quite recently stated in *Russell* v. *Minn. & St. Louis Ry. Co.*, 32 Minn. 230, (20 N. W. Rep. 147,) a case wherein the injury resulted from the use of a freight engine with the customary draw-bar upon a baggage-car furnished as is usual with the Miller coupler and buffer. There the combination was a freight engine and a car equipped for passenger trains; here it was a passenger engine and a freight-car built for that use only. There the damage was caused because noth-ing was provided which would prevent the locomotive from coming dangerously near the car, should the ends of the draw-irons slip past each other, as they might do under certain circumstances, but not often; here it was caused by the absence of something which would prevent an appliance of no value upon a freight engine from contin-ually being very dangerous to a brakeman who occupies the proper position for coupling a freight engine to a freight-car, and for prop-erly and with reasonable safety performing his duty; and plaintiff was confessedly in this position when injured. It may also be no-ticed that in the *Russell* case the plaintiff was a brakeman upon a train, part passenger and part freight, and had been using the coup-lers by which he was hurt for some time,—had become accustomed

to them; while in this the plaintiff was a brakeman upon a freight only, and had never before been called upon to use a goose-neck draft-iron upon any kind of a train. If, upon a comparison of facts in these cases, there is an advantage, it is with this plaintiff; but on the whole they are so much alike that a great deal of what is said *in re* Russell is pertinent and strictly applicable here.

The plaintiff testified that he did not see the goose-neck on the locomotive until it was upon him. This testimony is characterized by appellant as incredible, because, as it claims, the casting was large enough, and must have been observed when the plaintiff looked for and discovered the link in a pocket just beneath the neck. We must assume the plaintiff's statement to be the fact, although it may seem strange that the iron escaped his attention. But it must be borne in mind that he was somewhat inexperienced, had worked about one week for defendant, was then laid off for a few days, and had only secured a place the morning of the accident, because another man had failed to report for duty. His mind was upon making a coupling precisely as he had made it before under like circumstances, and with the same instrumentalities. He had not been informed, nor had he learned by experience, that occasionally a passenger engine is put upon a freight train, and therefore may have not been in a condition to either notice or realize the situation that morning. But, had he observed the goose-neck, we are not prepared to say that this knowledge would have prevented a recovery in this action. By examining such an appendage when in its place in the train it will be seen that it passes over the iron of the car, and strikes the buffer above it. On reflection, one who had noticed this, and who knew something of the distance from the end of the iron upon a freight-car and the dead-wood above it, would realize the danger in holding the coupling-pin in the usual way, and by a closer examination of the neck would discover that it is not solid, but has a large vertical aperture through which the pin may be dropped, as before mentioned, although the size of this aperture indicates that it is in part designed to lighten the casting. Even if he did inspect the appliance, it would not conclusively follow that by reason of such inspection, or the examination which he perhaps ought to have given it, that he did or

should have understood the risks to which he was exposed in attempting to make the coupling in the usual and prescribed way for brakemen on freight trains. It might not occur to him, although a man of ordinary prudence, that the defendant would expose him without warning to such a risk, or would furnish a locomotive on which was a draft-iron notoriously unsafe when used by inexperienced men in connection with the common box-car. And a person could easily ride upon the tender through the switches, as did plaintiff, without making the discovery that when the car was reached, and its coupling to the tender practicable, the end of the neck would of necessity have passed by and over the iron on the car. Nor would the examination which could be given as the neck approached the brakeman standing at his post, and about to make a coupling, clearly indicate to him that it projected so far as to be dangerous and unsafe. The master well knows from measurements, from actual and practical observation, and from the knowledge of the purpose for which these various instrumentalities are designed, just when and how they may be used with a reasonable degree of safety to his servants. But he must not expect them to have this same knowledge without some opportunity for acquiring it. This case is not distinguishable from *Russell* v. *Minn. & St. Louis Ry. Co.*, 32 Minn. 230, (20 N. W. Rep. 147.)

Order affirmed.