UNION MUT. LIFE INS. CO. OF PORTLAND, ME., v. PAYNE et al.

(Circuit Court of Appeals, Fifth Circuit. November 20, 1900.)

No. 906.

1. APPEAL—REVIEW—PRESUMPTIONS.

It will be presumed on appeal that special instructions asked were properly refused on the ground that they were covered by the general charge, where the record does not contain all of the general charge, nor show that it contains all that related to the subject matter of the special instructions.

2. LIFE INSURANCE—ACTIONS ON POLICY—BURDEN OF PROOF AS TO SUICIDE.

In an action on a life insurance policy, in which defendant pleads as a defense that the insured committed suicide, which avoided the policy under its terms, the rule that the burden rests upon the defendant to establish such defense affirmatively is not changed by the fact that the proofs of death furnished by the plaintiff stated the cause of death as suicide.

3. SAME—STATEMENT IN PROOFS OF DEATH—ESTOPPEL.

A statement in proofs of death furnished a life insurance company that the insured committed suicide does not estop the plaintiff in an action on the policy as matter of law, the defendant not having been prejudiced thereby, but is merely evidence to be considered and given such weight as the jury think it entitled to in connection with all other evidence on the subject.

4. SAME—CONSTRUCTION OF POLICY—PROVISION AGAINST SELF-DESTRUCTION.

A provision in a policy of life insurance that "self-destruction, sane or insane," is a risk not assumed by the company under the contract, applies only to suicide intentionally committed, and does not include accidental self-killing.

Pardee, Circuit Judge, dissenting.

In Error to the Circuit Court of the United States for the Eastern District of Texas.

Felix H. Robertson, for plaintiff in error.

Robert R. Hazlewood and Cecil H. Smith, for defendants in error.

Before PARDEE, McCORMICK, and SHELBY, Circuit Judges.

SHELBY, Circuit Judge. On the 11th of July, 1893, the Union Mutual Life Insurance Company of Portland, Me., a corporation duly incorporated under the laws of Maine, issued a policy for $2,000 on the life of James B. Payne. The policy was payable to Myra A. Payne, the wife of the insured. James B. Payne died on December 23, 1893. Myra A. Payne assigned an undivided one-half interest in the policy to R. R. Hazlewood and C. H. Smith. Myra A. Payne and Hazlewood and Smith, citizens of the state of Texas, brought this action on the policy against the Union Mutual Life Insurance Company. The defendants filed an answer denying the averments of the petition, and alleging that the death of James B. Payne was caused by suicide. The answer showed also that the application for the insurance made by James B. Payne and Myra A. Payne contained the following statement: "And that self-destruction, sane or insane, within one year from the date of issue of policy are also risks not assumed by the company in the contract." The application was made a part of the contract of insurance. It was further stated in the answer that Myra A. Payne, in making the proof of the death of the

insured, had made an affidavit that James B. Payne had committed suicide. The plaintiffs, in their replication, averred that, since Myra A. Payne had signed the proof of death, she had learned that the immediate cause of the death of James B. Payne was not suicide, but that he was assassinated, or that his death was the result of an accident, and that when Myra A. Payne signed the proofs of death she was in great trouble and distress on account of the death of her husband, and in feeble health, and that she signed the proofs of death without reading them. The case was tried on these issues. The plaintiffs offered in evidence the policy and the assignment of the undivided one-half interest. Myra A. Payne, as shown by the bill of exceptions, testified as follows:

"'I reside in Waco, Texas. I knew James B. Payne. He was my husband. He is dead. He died in Waco, Texas, on the 23d day of December, 1893.' The witness being shown said insurance policy said she was the person named in said policy as beneficiary, and that the James B. Payne named as the person whose life was insured was her husband. She had by her husband three sons, respectively eleven, thirteen, and nineteen years of age, at death of J. B. Payne. He owned a ranch of one thousand acres in the country near Waco, and just before his death he was making plans to place his oldest son in charge of this ranch. The other two boys were in school. That he was very much devoted to his boys. She and her husband lived happily together, and never had any disagreement. That she never at any time said anything, or heard her husband say anything, or know anything in his life, that indicated any intention on his part to commit suicide, and that he had no reason to do so."

### On cross-examination Mrs. Payne said:

"I have testified by depositions twice in this case. After the death of my husband, James B. Payne, Messrs. Jones, Kendall & Sleeper were my attorneys, and they aided me in the conduct of my business." (Being shown an affidavit signed by her, and sworn to before W. M. Sleeper, notary public of McLennan county, Tex., on the 15th of January, 1894, the witness declared the signature to said affidavit to be her genuine signature.) "The W. M. Sleeper who signed the jurat to said affidavit was at that time a member of the firm of Jones, Kendall & Sleeper. The proof of loss or death was prepared under the direction of my attorneys. I was at that time in no condition to attend to my business, and I have no recollection of having signed or sworn to that proof of death."

### On redirect examination Mrs. Payne testified:

"On the morning of Mr. Payne's death I went into his bedroom to call Mr. Payne, who was called for by one of the men working for him; and as soon as I got into the room I could tell from the look on his face that he was dead. I screamed, and ran from the room. I did not see any wound or pistol, and I never saw the body afterwards. I do not know of my own knowledge what caused his death; only what others told me."

The defendant company then offered in evidence the application for the insurance policy, signed by the insured, Payne, and his wife. It contained the stipulation as to suicide which has already been quoted. The defendant company then offered in evidence an affidavit or proof of death, signed by Myra A. Payne, dated January 15, 1894, which contained the following questions and answers:

"(11a) Remote cause of death? (a) Nervous depression, aggravated by grippe. (b) When did health of deceased first begin to be affected? (b) About two or three months before his death. (c) Immediate cause of death? (c) Self-destruction. (d) Duration of last illness? (d) About two weeks. (e) Give every particular in relation thereto within your knowledge. (e) Had been unwell for

a month or two. Was attacked by grippe about two weeks before his death. Became melancholy, and, when alone, shot himself. * * * (13a) Did the deceased violate any condition of above-mentioned policy in respect to residence, travel, occupation, dueling, suicide, or violation of law? (a) Not within my knowledge, except suicide, if that be violation."

Depositions of Myra A. Payne were in evidence, in which she testified:

"I was told that the immediate cause of his death was a pistol shot, but I never saw it, and do not know. * * * I was greatly depressed, and cannot say what the affidavit contained. I was not in a frame of mind to know much about anything. All my papers were prepared for me by others, and will have to speak for themselves."

The following is the statement made by Myra A. Payne before the coroner:

"My name is M. A. Payne. I was the wife of the deceased, J. B. Payne. Mr. Payne died in McLennan county, Texas, on the 23d day of December, 1893. He was in his fiftieth year at the time of his death. Deceased had been sick for about two weeks before his death, but on the day before his death and the day preceding that he had been able to go from his house down town, but he remained in town but a few hours each day. He was not ill enough to call a physician. We thought he had la grippe. He was nervous, and complained of feeling bad and having no appetite. On the morning of his death he did not get up to breakfast. He said he did not want any. I heard a noise about half past eight, or earlier, which I thought was the slamming of a door. About an hour afterward, as nearly as I can judge, I went to the room of deceased. I went into the room, and saw deceased on the bed. Before I got to the bed, I discovered that he was dead. He was lying on his back, with a pistol in his right hand, which was lying across his breast. There was a pistol or gunshot wound in the right temple. Deceased seemed very much depressed during the whole two weeks of his illness. The room occupied by deceased was on the second floor. I was in the dining room, on the first floor, at the time I heard the noise which I now think was the explosion of the pistol. I was on the place at the time with my three children, James B. Payne, Mack Payne, and Walter Payne, aged twenty, twelve, and eleven years, respectively, with me. No one else was on the place. Mr. Oscar Armstrong came to see Mr. Payne later, and I went to his room to see if he would see him. I knew nothing of deceased's having a pistol with him until the time of his death.
"[Signed]                                        M. A. Payne."

In reference to this statement Mrs. Payne testified:

"There are some errors in that statement. I did not notice the position of Mr. Payne's hands. I only saw his face. * * * I can't remember much, if anything, that happened at that time. I recognize my signature to the original paper, but I can't remember signing my name to the paper."

The witness Mrs. Payne further testified:

"There are two doors and three windows opening into Mr. Payne's room. One door opens into the upper hall; the other door opens onto the upstairs veranda. Two of the windows open from the second story towards Fifth street. The other window opens on the upstairs gallery. There is only one pair of stairs which leads into the upper hall into which one of the doors of Mr. Payne's room opens. Four doors open into that hall. No stairway from the outside, but a person might pass from the upper hall, through a room adjoining the one in which Mr. Payne's body lay, out onto the upper outside gallery, and then into Mr. Payne's room through the door or the window."

The bill of exceptions states that "other evidence" was introduced, but that it was not "material to these exceptions." There was a verdict and judgment on the policy against the insurance company.

The only questions before the court for decision are raised by the following four assignments of error.

"(1) The court erred in refusing to give the first special charge asked by the defendant, and being as follows, viz.: 'Under ordinary circumstances it is true that, if there be a doubt whether the death of a person assured was the result of accident or of suicide, this doubt must be solved in favor of the theory of accident. But in this particular case the plaintiff Myra A. Payne, having in her proof of death stated to the defendant company that the death of James B. Payne was "self-destruction," it is incumbent on her to satisfy the jury that in this statement she was mistaken, and that death was the result of assassination or accident.'

"(2) The court erred in refusing to give to the jury the second special charge requested by the defendant, being as follows: 'The uncontradicted testimony shows that James B. Payne died on the morning of December 23, 1893, from the effects of a pistol-shot wound which entered his head at the right temple. Among other testimony, there has been introduced before you a certain paper called "Proofs of Death," which the plaintiff Myra A. Payne caused to be delivered to the defendant company in January, 1894. You are instructed that said proofs of death were intended to be acted on by the defendant company, and upon their truth the company had the right to rely; and, unless corrected for mistake, the plaintiffs in this case are bound by the statements made in said proofs of death. Good faith and fair dealing require that the plaintiffs should be bound by the representations deliberately made in the proofs of death until it be shown that such representations were made under a misapprehension of facts, or in ignorance of material matters subsequently ascertained.'

"(3) The court erred in refusing to give to the jury the third special charge asked by the defendant, being as follows, viz.: 'If the jury believe from the testimony that J. B. Payne came to his death by his own act,—shooting himself with a pistol,—and if, when he shot himself, he was either sane or insane, and so did the act intentionally or unintentionally, the plaintiffs, being bound by the condition expressed in the * * * article of "Rights," on the second page of the application, which is a part of the policy sued upon, cannot recover, and you will return a verdict for the defendant.'

"(4) The court erred in its general charge to the jury in giving all that portion in reference to the facts pleaded and relied on by plaintiffs to show that the immediate cause of the death of said James B. Payne was not 'self-destruction,' but that the said James B. Payne was assassinated, or that his death was the result of an accident; and in reference to the statement made by Myra A. Payne to the defendant that the remote cause of the death of J. B. Payne was nervous depression, aggravated by grippe, and that the immediate cause of the death of J. B. Payne was self-destruction, which portion is as follows, viz.: 'You are instructed that, if Mr. Payne's death was the result of a gunshot wound self-inflicted, and intentionally so, that this is a bar to a recovery in this case, and you will find for the defendant. By the term "self-destruction," as used in this contract, is meant where the party intends to take his own life intentionally. It does not cover, in my opinion, a case where death may be caused by the hand of the insured party where the injury is accidental, and not intentionally inflicted. Therefore, in this case, you will determine the question between the parties as to this issue, and determine it from all the evidence offered both on the part of the plaintiff and on the part of the defendant. Was Mr. Payne's death the result of a gunshot wound intentionally inflicted with intent to take his own life? If you find as a matter of fact that it was so inflicted, and with such intent, you will find for the defendant. But if you find from the evidence that it was accidental killing, assassination, or that his death came about from any cause other than a self-inflicted wound, you will find for plaintiff. Plaintiff having introduced her policy and proof of the death of the deceased, James B. Payne, that would prima facie entitle the plaintiff to recover the amount of the policy. And, the defense of self-destruction being interposed by the defendant, it becomes an affirmative defense, and places the burden on defendant to establish by a preponderance of the evidence the defense thus asserted. In other words, the burden of proof rests upon defendant to establish by a preponderance of the

evidence the fact that the exception in the policy applies; that is, that the death of the deceased was the result of a self-inflicted and intentional wound with intent to take his own life. The proofs of loss introduced in this case in which Mrs. Payne stated or is purported to have stated that the death of the deceased was caused by suicide, or words to that effect, upon that you are instructed that you have heard all the evidence in this case. It does not appear that the defendant relied upon these statements, or parted with any right by reason of them, or was misled by them; and therefore it is a question of whether or not Mrs. Payne is bound by these statements. You are instructed that she has the right to introduce proof to show whether or not she stated a fact she knew, or something that she was informed of. You have heard her statement that she saw her husband's dead body, and did not see any wound or pistol, and had seen none when the proofs of loss were filled out and signed by her, and that she has no personal knowledge of the manner of her husband's death. What I mean is that she only gives her information from other parties as to the death being caused by a gunshot wound. If you believe that explanation to be true, and that those were the circumstances under which she made the proof of loss, the fact that the proof of loss contains the statement that he came to his death by suicide would not conclude her in this case. You might consider it simply as a circumstance in the case, in connection with other evidence, in determining the main question of whether it was a self-inflicted and intentionally inflicted wound with the intent to take his life. That is the sole question for your determination, as I view this case. In determining that question you have the right to look at the conditions surrounding the party to ascertain a motive or want of motive. You have the right to consider in the course of human affairs whether a party who is in the enjoyment of wealth, whose business is good, whose marital relations are pleasant, and things of that kind, whether he would intentionally take his own life or not. You have also the right to look at the condition of the man to decide whether such condition did exist, or whether such a state of affairs existed, that he probably or likely took his own life. These are questions that you can consider in arriving at a solution of the question. No person saw the act committed. No one can speak from personal knowledge as to how it occurred, and you are to determine that from the evidence as gleaned from the witnesses by considering the motives that impel people to such an act, and from these matters determine the question of whether it was self-inflicted with intention to take his own life, or whether it was accidental, or the result of assassination. As already stated, if it was intentionally inflicted, it debars recovery, and your verdict will be for defendant. If it was not self-inflicted, and the burden of proof fails to establish to your mind that it was self-inflicted with the intention of taking life, your verdict should be for the plaintiffs.'"

1. The court refused to give charge No. 1 because it was "covered in main charge, so far as applicable to this case." Charge No. 2 was refused, as shown by the bill of exceptions, for the same reason. The entire charge of the court does not appear in the record, nor does it appear from the bill of exceptions that all of the general charge is given, which relates to the matters referred to in the special charges numbered 1 and 2. The statement of the trial judge that the requested charges were embraced in the general charge of the court must be accepted as sufficient reason for the refusal to give them, when the bill of exceptions does not give the entire charge, or show affirmatively that it contains all of that portion of the general charge which relates to the points raised by the special charges asked. Even when the bill of exceptions does not state such reason for refusing to give the charge, it is held that, when the instructions of the court, or part of them, are omitted from the record, it will be presumed that instructions refused were properly covered by other instructions given. To secure a reversal, the bill of exceptions should

be so written as to remove such presumption. 11 Enc. Pl. & Prac. 300; Myers v. Sternheim, 38 C. C. A. 345, 97 Fed. 625. The court, however, was justified in refusing to give charge No. 1 because it improperly stated the law as to the burden of proof. In Association v. Sargent, 142 U. S. 691, 12 Sup. Ct. 332, 35 L. Ed. 1160, the issues were very similar to the issues in the case at bar. The supreme court sustained the following charge given by the trial judge:

"The only question upon this proof is, did Edward F. Hall commit suicide? If he did, the policy is void. If he died in some other way,—by accident or assassination,—it would be otherwise. Upon that issue, the burden is upon the defendant to satisfy you by a fair preponderance of proof of the truth of this defense. * * * When the policy of insurance was introduced with evidence or admissions that the premiums had been paid, and proof was given of the death of the assured, the plaintiff, if no further evidence had been produced, would have been entitled to a verdict; but the defendant comes into the court, and asserts that the contract under which the action is brought has not been fulfilled, but has been violated by the assured. Being an affirmative defense, the onus is upon the defendant to satisfy you by evidence which, in your own judgment, outweighs the evidence of the plaintiff, that that defense has been established."

The statement made by Mrs. Payne in the proof of death that the cause of her husband's death was "self-destruction" was before the jury with her evidence given on the trial. She had sworn that she signed the statement without knowledge of its contents, and under circumstances of great distress. She had also stated that her only personal knowledge on the subject was that she saw her husband lying dead on his bed. "I was told," she said, "that the immediate cause of his death was a pistol shot, but I never saw it, and do not know." When she saw her husband's face, she knew he was dead, and "she screamed, and ran from the room. I did not see any wound or pistol, and never saw the body afterwards." The fact that she had signed the contradictory statements did not change the well-established rule as to the burden of proof. The insurance company, as a defense, had pleaded that the insured had committed suicide, and the burden was on the company to prove the defense. The contradictory statements were properly received in evidence, but we do not understand that they changed the rule as to the burden of proof, and "made it incumbent on her to satisfy the jury that in the statement she was mistaken, and that the death was the result of assassination or accident." It was incumbent only on the plaintiffs to prove the death. The burden was on the defendant to show suicide, and the statement of Mrs. Payne in the proofs of death was properly received to prove it, and, in the absence of explanation or contradiction, it might have been held quite sufficient.

2. Charge No. 2 is misleading. The phrase in the charge, "and unless corrected for mistake," would have led the jury to believe that the proof of death was conclusive against the plaintiffs in the action unless it was withdrawn from the files, and amended or corrected. The charge is also erroneous as to the burden of proof. In Association v. Sargent, 142 U. S. 691, 699, 12 Sup. Ct. 335, 35 L. Ed. 1165, the court said:

"But the defendant was not prejudiced by the statements and opinions contained in the proofs of death, and the plaintiff was not estopped thereby, as a

105 F.—12

matter of law. When the court was asked to charge the jury that by the introduction of those proofs the burden was shifted, the evidence was all before the jury, and was much more full and complete than that upon which Dr. Jenkins had based his opinion. He himself had been examined as a witness, and had testified as to what he knew or did not know at the time he made his certificate; and all the facts of the case, so far as they were known, had been explained in view of the contents of the proofs of death. It appeared that most of the statements in the certificate of Dr. Jenkins were based on hearsay. The instructions asked for in that respect, therefore, would have been erroneous."

3. The court properly refused to give charge No. 3. The court refused to give it, as shown by the bill of exceptions, "because it precludes recovery even if the deceased accidentally killed himself." The charge is capable of this construction, and, so construed, it would be erroneous. If the charge does not properly bear such construction, and refers only to suicide, then it is fairly included in the parts of the general charge of the court as it appears in the bill of exceptions.

4. The fourth assignment of error excepts to part of the general charge which is set out in the exception. It is excepted to and assigned as error as a whole. The question being presented in that way, if any material proposition contained in it is correct, the exception and assignment cannot prevail. Mississippi Val. Co. v. Pace, 158 U. S. 36, 15 Sup. Ct. 743, 39 L. Ed. 887. But we find nothing in the entire charge as set out that is erroneous. It fairly left the question of suicide to the jury, and it is correct as to the burden of proof. If it be assumed that it is proved that the insured died from the effects of a pistol shot, it must have been caused either by suicide, accident, or assassination. If it occurred by suicide, whether the insured was sane or insane, the plaintiffs could not recover on the policy. If it occurred by accident or by assassination, the defendant is liable on the policy. Accidental or unintentional self-killing does not forfeit a policy for suicide. "Self-destruction," as used in the contract of insurance here in question, means suicide, and does not include accidental self-killing. May, Ins. (2d Ed.) § 207; Breasted v. Trust Co., 59 Am. Dec. 489, and note, § 3. The insurers frame their own contracts, and, when they choose, they may insert express stipulations against accident. "If they prefer, for the purpose of getting custom, to omit such a stipulation, and to leave the matter in doubt, the doubt ought to be resolved against them." Keels v. Association (C. C.) 29 Fed. 201.

None of the assignments of error is well taken. The judgment of the circuit court is affirmed

PARDEE, Circuit Judge, dissents from the conclusion of the court.