### NORTHERN PAC. RY. CO. v. TYNAN.

(Circuit Court of Appeals, Ninth Circuit. October 6, 1902.)

No. 790.

1. MASTER AND SERVANT—DEFECTIVE RAILROAD CARS—ASSUMED RISK.

It is the duty of a railroad company, which it owes to its employés as well as to the public, to use reasonable care to see that the cars used on its road are in good order and fit for the purposes for which they are intended; and an employé has the right to rely upon the performance of this duty, and does not assume the risk arising from the company's neglect to perform it.

2. SAME—CONTRIBUTORY NEGLIGENCE—COUPLING CARS.

The burden of proving contributory negligence of an employé, to defeat recovery for his injury, rests on the master; and it must be shown not only that he was negligent, but that his negligence caused or contributed to the injury. The fact that a brakeman, killed while attempting to couple cars on a side track which was on a curve, was working from the inside of the curve, does not warrant an instruction that he was guilty of negligence, as a matter of law,—much less, that he was guilty of contributory negligence,—where there was evidence that, with the cars to be coupled, there was as little danger on the inside as on the outside.

5. SAME—ACTION FOR DEATH OF BRAKEMAN—QUESTION FOR JURY.

Plaintiff's intestate, while employed as a brakeman by defendant railroad company, was killed while attempting to couple two cars on a side track. One of the cars was equipped with an old-style Miller hook coupler. It was little used, and when used was coupled to cars having link and pin couplers; but it was not blocked to hold the hook in position, as customary when such cars are so used, and was old and not in good repair. The other car had also an old-style skeleton link and pin coupler, not generally in use, and the coupling between the two was more than usually dangerous. Deceased was not instructed as to the kind of couplers, and, so far as appeared, did not know the kind in use on such cars. Held, that defendant was negligent in the use of such appliances, and that, in the absence of conclusive proof of contributory negligence, the court properly refused to direct a verdict for defendant.

---

¶ 1. See Master and Servant, vol. 34, Cent. Dig. § 554.

**4. Appeal—Review—Refusal of Instruction.**

A judgment will not be reversed on appeal because of the refusal of instructions requested, where the record does not contain the entire charge given.

In Error to the Circuit Court of the United States for the District of Oregon.

To clearly understand the contentions of the respective parties, and the opinion of the court, it is essential to outline the substance of the testimony given at the trial. The testimony shows that the deceased went to work for the railway company as brakeman on its Burke-Wallace Branch about three weeks prior to his death; that he was a competent, skillful brakeman; that the train crew consisted of Chattin, as conductor, the deceased, and Chester, as brakeman; that on the morning of March 13, 1899, deceased and Chester were, pursuant to Chattin's orders, engaged in the Wallace yards in making up the train that was to leave for Burke; that Chattin told them to get a certain box car off of a yard track called the "Nine-Mile Track," and put it in the train behind coach 417, which was the passenger coach regularly used on that run; that in front of said box car on the nine-mile track was coach 645; another coach was standing on the adjoining house track; to get said box car in its proper place in the train, deceased and Chester had to first move the coach on the house track, to throw the switch, and get in over the frog to the nine-mile track, and then couple onto and move coach 645; that deceased and Chester were doing the coupling and switching and braking required in the making up of the train; that Chattin did not get over to where they had been working until after the deceased was injured, and just as he died; that deceased and Chester were proceeding in the right way to get said box car, when, in the act of coupling coach 417 onto coach 645, for the purpose of moving the latter and getting at the box car, deceased was injured; that, immediately before and at the time of the injury, Chester was on top of the box car for the purpose of letting off the brake thereon, and said brake was not to be let off, nor Chester leave the top of the box car, until deceased had coupled 417 to 645, and also coupled the other end of 645 to the box car, and then Chester was to release the brakes on the box car; that the coupler on the end of 417 was a skeleton drawbar, made of malleable iron, and riveted together; this skeleton draw bar was an old-style link and pin coupler, the first one that was ever gotten out, and was unhandy and dangerous, and, in making a coupling between it and any other coupler, a link and two pins would have to be used; that this skeleton drawbar on 417 was different from, and more dangerous and inconvenient to use than, the ordinary style of skeleton drawbars; that 645 was an extra coach, not used regularly; that it was equipped with Miller hooks on both ends; that it was the only car used on the Burke Branch that was equipped with Miller hooks; that the Miller hook was an old-style coupler, designed and intended for passenger coaches, to be used automatically with another Miller hook, and at the time of the injury was not in general use; that more modern automatic couplers had been in general and successful use on both passenger coaches and on freight cars for some time before the deceased was injured; that the head of the Miller hook is hook-shaped; that the coupler has a long shank, which sets, and has considerable play and lateral motion in a carrying iron; that this play and motion allow the sloping sides of the heads, as two Miller hooks come together, to slip by each other until the hooks pass, when, by the action of a large heavy spring back of the carrying iron, the hooks are forced and grip together, and thus an automatic coupling is effected; that a Miller hook will only couple automatically with another Miller hook; that, to couple it to anything else, a link and pin must be used; that a coupling between a Miller hook and a skeleton drawbar is the most dangerous and difficult coupling known to trainmen; that a coupling could be much more easily effected between a Miller hook and skeleton drawbar of the ordinary style than between the particular Miller hook and the particular skeleton drawbar that were actually used on coaches 645 and 417; that the employés on the

Wallace-Burke Branch had, prior to the employment of deceased, complained to the railway officers of the danger of making couplings between Miller hooks and skeleton drawbars, and had requested the removal of the objectionable equipment; that the lateral motion of the Miller hooks could be prevented by putting blocks and wedges in the carrying iron or stirrup that holds the Miller hook; that when thus blocked the space where the Miller hook would otherwise move from side to side in the carrying iron is filled in with the block that is strapped or bolted there, which prevents the Miller hook from shoving over; that it was customary and usual to block Miller hooks when they were habitually used in making link and pin couplings; that the Miller hook on 645 was not blocked in any way, and was used in nothing but link and pin coupling; that in the ordinary performance of the duty of coupling cars a brakeman could not observe whether or not a Miller hook was blocked; that, owing to the infrequent use of 645, the train crew were seldom called on to make a coupling between a Miller hook and skeleton drawbar, and deceased had not attempted, so far as known, to make such a coupling during his employment by the railway company; that deceased was never warned by defendant, or any of its officers or employés, of the danger of making a coupling between a Miller hook and skeleton drawbar; that the proper and the safest way to make the coupling between the Miller hook on 645 and skeleton drawbar on 417 was to first put the link in the skeleton drawbar (417 being the moving car), and then guide such link by hand into the Miller hook on 645; that deceased had endeavored to make the coupling in that way; that an examination made immediately after the injury disclosed the fact that the ends or heads of the two couplers had slipped by each other so that the Miller hook was slipped in behind the lip of the skeleton drawbar, thereby allowing the platforms of the two coaches to come much closer together than they should come; that attached to the platforms of 417 and 645 were iron buffer plates, with springs attached to the back thereof, the object and purpose of which was to take up the slack and prevent the cars coming together with a jar; that the buffers were not designed or intended to keep the couplers far enough apart to prevent a man who was coupling them together from being squeezed to death; that there were no bumpers or deadwood or anything else on said coaches which would prevent such a result, or which would, in the event of the couplers passing each other, keep the platforms further apart than the thickness of those bumpers,—about three inches; that the coaches were on a curve at the time of the injury; that deceased was making the coupling from the inside of the curve; that an ordinary link and pin coupling can be made as easily and safely on a curve as on a tangent; that cars on a curve are ordinarily and generally coupled from the inside of the curve, because ordinarily the trainmen cannot from the outside, and can from the inside, see and give signals to the engine; that the coupling between 417 and 645, which deceased was making, could be as safely made from the inside as from the outside of the curve; that deceased was compelled to make the particular coupling from the inside of the curve, because he could not signal the engineer from the outside of the curve, for two reasons, namely, (1) the cars and train which they were making up, stood in the way, and (2) cars on the house track, which was next to the nine-mile track on the outer side of the curve, stood so close to the nine-mile track at the place of coupling that the deceased could not get far enough away from such outer side; that it was not practicable to make a coupling between the Miller hook and skeleton drawbar with a stick or knife or coupling pin; that the railway company's rule that requires couplings to be so made was universally disregarded, and no attempt was ever made by the railway company to enforce it.

B. S. Grosscup and Jas. F. McElroy, for plaintiff in error.

Arthur C. Spencer, Dan J. Malarkey, and Carey & Mays, for defendant in error.

Before GILBERT and ROSS, Circuit Judges, and HAWLEY, District Judge.

HAWLEY, District Judge, after making the foregoing statement, delivered the opinion of the court.

This action was brought by the administrator of the estate of John Tynan, deceased, under the provisions of the Revised Statutes of Idaho of 1887 (section 4100), to recover damages for the death of John Tynan, which occurred while he was employed as a brakeman by the railway company, and engaged in attempting to couple two of its cars. The coupler on one of the cars was a Miller hook, and the coupler on the other was a skeleton drawbar. It is alleged in the amended complaint that both couplers were old, and not adapted to each other or fit for use; that they were faulty in construction, out of repair, and did not couple automatically by impact; that there were no bumpers or deadwoods or other contrivance on the end of the cars to prevent the platforms on each car coming together in case the couplers passed each other in attempting to effect a coupling; that the Miller hook was not blocked, adjusted, or fixed so as to prevent or reduce the lateral motion thereof in an attempt to couple it with a skeleton drawbar; that the railway company failed to warn the deceased of the faulty condition and character of the coupler, and of the danger that would accompany the act of making the coupling. The answer denies these allegations of the complaint, and, for affirmative defense, alleges that when the deceased applied to it for employment he was furnished with a book of rules for the guidance of its employés, and that rule 25 provided that, before making a coupling, employés should take time to examine and ascertain the style and condition of the coupling to be made, and notified them that couplings cannot be uniform in style, size, or strength; that the deceased at the time of his employment represented that he had nine years' experience in the railroad service, and promised that he would comply with the rules and regulations of the company, and would discharge the duties of his employment, and assume the risks thereof; that the deceased was guilty of neglect in making the coupling from the inside instead of the outside of the curve; that the deceased was guilty of negligence in making the coupling by placing the link in the skeleton drawbar instead of in the Miller hook; that the cars were used solely upon the Burke Branch, within the state of Idaho, and were not used in interstate commerce. Upon these issues the cause was tried before a jury, resulting in a verdict and judgment in favor of the defendant in error.

The principal error assigned is that the court erred in refusing to give the following instruction:

"I instruct you, gentlemen of the jury, that it will be your duty, under the evidence in this case, and the law governing the same, to return a verdict for the defendant, and I hereby so direct you to do."

A careful reading of the entire testimony contained in the record, a portion of which is embodied in the foregoing statement of facts, has convinced us that the court did not err in refusing to give this instruction.

On March 2, 1893, congress passed "An act to promote the safety of employees and travelers upon railroads by compelling common carriers engaged in interstate commerce to equip their cars with automatic couplers and continuous brakes." 27 Stat. 531 [U. S.

Comp. St. 1901, p. 3174]. This act has no special bearing on this case, except in so far as it suggests the reasons that led to its adoption. It is wholly immaterial whether the railway company was or was not engaged in the use of the cars in question in the business of interstate commerce, and we shall not discuss that question. Prior to the passage of this act there had been numerous decisions rendered by the courts of this country wherein it was held that the railroad companies were guilty of negligence in using the Miller coupler in connection with the ordinary link and pin drawbars. Russell v. Railway Co., 32 Minn. 230, 233, 20 N. W. 147; Hungerford v. Railway Co., 41 Minn. 444, 43 N. W. 324; Railway Co. v. Garrett, 73 Tex. 262, 13 S. W. 62, 15 Am. St. Rep. 781; Martin v. Railway Co., 94 Cal. 326, 329, 29 Pac. 645; Southern Pac. Co. v. Burke, 9 C. C. A. 229, 60 Fed. 704; Smith v. Railway Co., 72 Hun, 545, 25 N. Y. Supp. 638. These cases are all directly in point in favor of the ruling of the court below. But the present case is much stronger in its facts than in any of the cases cited, in this: that in the present case it is shown that there was no blocking, and that the couplings on each of the cars were old and particularly dangerous, even of their kind. The facts in the case of Railway Co. v. Archibald, 170 U. S. 665, 666, 18 Sup. Ct. 777, 42 L. Ed. 1188, closely resemble the facts in this case. It was there held that it is the duty of a railroad company to use reasonable care to see that the cars employed on its road, both those which it owns and those which it receives from other roads, are in good order and fit for the purposes for which they are intended, and this duty it owes to its employés as well as to the public; that an employé of a railroad company has a right to rely upon this duty being performed, and, while in entering the employment he assumes the ordinary risks incident to the business, he does not assume the risk arising from his employer's neglect to perform the duties owing to him with respect to the appliances furnished.

In the light of the testimony and of these decisions (many others might be cited to the same effect), the contention of the plaintiff in error that it had used ordinary and reasonable care in procuring and using proper and safe appliances for the coupling of its cars, and that its employé John Tynan, deceased, had assumed all the risks, and was himself guilty of contributory negligence, does not specially commend itself to the favorable consideration of this court. Kohn v. McNulta, 147 U. S. 238, 13 Sup. Ct. 298, 37 L. Ed. 150, and Southern Pac. Co. v. Seley, 152 U. S. 145, 154, 14 Sup. Ct. 530, 38 L. Ed. 391, upon which the plaintiff in error relies, are readily distinguishable in their facts from the case at bar. The party injured had in the one case seen and coupled the cars there used, and in the other well knew of the dangerous appliances, without complaining of their use. In neither case was it pretended that the appliances were out of repair, or in a defective condition, old, or unfit for use. Every case depends upon its own peculiar facts. The burden of proving contributory negligence on the part of the employé is always cast upon the railroad company, and the general rule is that it must not only appear that the employé was negligent, but it must also be shown that his negligence contributed to the injury. Coasting Co. v. Tolson, 139 U. S. 551, 557, 11 Sup. Ct. 653,

35 L. Ed. 270, and authorities there cited; Railway Co. v. Volk, 151 U. S. 73, 77, 14 Sup. Ct. 239, 38 L. Ed. 78.

Considerable stress is laid by the plaintiff in error upon the fact that the deceased was negligent in attempting to make the coupling from the inside of the curve. It is always easy to say that the injury which occurred might not have happened if the injured party had been on the other side or had used other methods in trying to make the coupling. But the question to be determined is whether or not he was guilty of negligence in attempting to make the coupling at the place, in the manner and under the circumstances shown by the testimony. There was testimony in this case tending to show that the coupling could have been made, while the cars were on the curve, with as little danger on the inside as on the outside. The reason why it was attempted on the inside is shown by the existence of obstructions which prevented the deceased from signaling the engineer on that side when the coupling was made, which was a part of his duty. In Bucklew v. Railway Co., 64 Iowa, 603, 609, 21 N. W. 103, the court said:

"The engineer occupies one side of the locomotive, and the fireman the other. The usual position of an employé desiring to make a signal for the purpose of controlling the movements of a train, when not on a curve, is on the engineer's side. In the present case the plaintiff was on the fireman's side when he gave the signal to stop the train. It is claimed the plaintiff cannot recover because he was not in his proper place. But there was evidence tending to show that, immediately prior to the time the signal was given, the train passed over a curve in the track, and that a signal given while the train was so passing from the engineer's side could not have been seen by him. Now, conceding that the train had passed a short distance beyond the curve, we cannot say that the plaintiff was negligent in not more promptly passing to the other side of the train before giving the signal."

But in any event the question of contributory negligence under the testimony, including rule 25 of the railway company, was one of fact, for the jury to determine. The law is well settled that no case should ever be withdrawn from the jury unless the conclusion necessarily follows, as a matter of law, that no recovery could be had upon any view which can properly be taken of the facts which the evidence tends to establish. Railroad Co. v. McDade, 135 U. S. 554, 571, 10 Sup. Ct. 1044, 34 L. Ed. 235; Railway Co. v. Ives, 144 U. S. 408, 417, 12 Sup. Ct. 679, 36 L. Ed. 485, and authorities there cited; Railway Co. v. Cox, 145 U. S. 593, 606, 12 Sup. Ct. 905, 36 L. Ed. 829; Gardner v. Railroad Co., 150 U. S. 349, 361, 14 Sup. Ct. 140, 37 L. Ed. 1107.

The other errors assigned relate to the refusal of the court to give instructions to the jury as requested by the railway company. We shall not review these instructions, because it would be impossible, in the absence of the whole charge, to decide whether or not the court erred in refusing to give any of the requested instructions. The record does not contain the entire charge of the court to the jury. It does show that the railway company took exceptions to two points that were contained in the charge, and that upon both of these points the exceptions of the railway company were allowed by the court. For aught that appears from the record, the court, of its own motion, may have properly instructed the jury upon all the points sought to be raised by the assignments of error. When the entire charge is not

given in the record, it is the duty of the appellate courts to presume that the requested instructions were refused because substantially given in the general charge. Scaife v. Land Co., 33 C. C. A. 47, 90 Fed. 238, 246; Case v. Hall, 36 C. C. A. 259, 94 Fed. 300, 302; Myers v. Sternheim, 38 C. C. A. 345, 97 Fed. 625; Railway Co. v. Wineland, 42 C. C. A. 588, 102 Fed. 673, 676; Insurance Co. v. Payne, 45 C. C. A. 193, 105 Fed. 172, 176; Reagan v. Aiken, 138 U. S. 109, 113, 11 Sup. Ct. 283, 34 L. Ed. 892; Andrews v. U. S., 162 U. S. 420, 424, 16 Sup. Ct. 798, 40 L. Ed. 1023.

In Myers v. Sternheim, supra, this court said:

"The only other point relied upon by the plaintiff in error arose out of exceptions to the charge of the court, but a reference to the record shows affirmatively that the plaintiff in error has brought up only a part of the court's charge, and there is nothing to indicate that the omitted portion had no bearing upon the point made. Under such circumstances, we would not be justified in reversing the judgment, even if, in the portion of the charge brought here, error appeared, since, in the portions of the charge omitted, the error, if any, may have been corrected."

The judgment of the circuit court is affirmed, with interest and costs.